UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| C&L, LLC; DEN-TEX CENTRAL, INC.; DEN-TEX CENTRAL II, INC., TOWIN 6840, LLC; TOWIN 6966, LLC; TOWIN 8583, LLC; and TOWIN 8872, LLC, individually and on behalf of all persons similarly situated,<br><br>       Plaintiffs,<br><br>    v.<br><br>CAL-MAINE FOODS, INC.; DAYBREAK FOODS, INC.; HILLANDALE FARMS OF PA, INC.; HILLANDALE-GETTYSBURG, LLC; ROSE ACRE FARMS, INC.; OPAL FOODS, LLC; VERSOVA HOLDINGS LLP; URNER BARRY PUBLICATIONS, INC. d/b/a EXPANA; EGG CLEARINGHOUSE, INC.; and UNITED EGG PRODUCERS d/b/a EGG FARMERS OF AMERICA,<br><br>       Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMAND |

TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  PARTIES .......................................................................................................... 3

     A.   Plaintiffs ................................................................................................ 3

     B.   Defendants ............................................................................................. 5

          1.   Cal-Maine ...................................................................................... 5

          2.   Daybreak ....................................................................................... 6

          3.   Hillandale Farms ........................................................................... 6

          4.   Rose Acre ...................................................................................... 7

          5.   Opal Foods, LLC .......................................................................... 7

          6.   Versova Holdings LLP .................................................................. 8

          7.   Urner Barry Publications, Inc. d/b/a Expana ............................... 8

          8.   Egg Clearinghouse, Inc. ................................................................ 9

          9.   United Egg Producers .................................................................... 9

III. AGENTS AND CO-CONSPIRATORS ......................................................... 10

IV.  JURISDICTION AND VENUE ..................................................................... 11

V.   FACTUAL ALLEGATIONS ......................................................................... 12

     A.   Background on Eggs ............................................................................ 12

          1.   Eggs Are a Vital Consumer Good ............................................... 12

          2.   The United States Egg Market ..................................................... 12

          3.   The Conventional Eggs Market .................................................... 15

          4.   Conventional Eggs Are a Commodity Product............................ 17

          5.   Conventional Egg Production is Dominated by Producer Defendants
               and Consolidating ........................................................................ 17

          6.   The Price of Conventional Eggs Has Skyrocketed Since 2022 ... 19

          7.   Industrywide Conventional Egg Prices Are Set by "Formula Pricing"
               that Has Significant, Confidential Input from Producer Defendants ........ 20

          i.   Egg Clearinghouse, Inc. ............................................................... 21

          ii.  The Urner Barry Benchmark for Conventional Eggs .................. 22

     B.   Defendants' Coordinated Scheme to Inflate the Price of Conventional Eggs ...... 24

1.   Manipulation of the Urner Barry Benchmark ..................................................... 24

2.   Restriction of Industry Capacity to Ensure that Elevated Prices
     Persisted ........................................................................................................... 28

C.   Soaring Egg Prices Cannot Be Explained by Market Conditions......................... 34

1.   Demand Conditions Do Not Explain Elevated Conventional Egg
     Prices................................................................................................................ 35

2.   Production Costs Do Not Explain Elevated Conventional Egg Prices ..... 36

3.   There Have Been No Material Constraints on Rebuilding Additional
     Capacity ........................................................................................................... 39

4.   HPAI Outbreaks Do Not Explain Inflated Conventional Egg Prices ....... 40

5.   Economic Analysis Shows that the Spike in Egg Prices is Attributable
     to Defendants' Conduct, and not Rising Feed Prices or Avian Flu
     Infections.......................................................................................................... 41

D.   The Structure and Characteristics of the Conventional Egg Market Make the
     Conspiracy Economically Plausible ...................................................................... 43

1.   The Market for Conventional Eggs Is Vertically Integrated ..................... 43

2.   Demand for Conventional Eggs Is Inelastic and Has Not Increased ........ 44

3.   The Market for Conventional Eggs Has Experienced Significant
     Consolidation ................................................................................................... 44

4.   Defendants Had Numerous Opportunities for Communication and
     Exchange of Information .................................................................................. 45

5.   High Barriers to Entry Facilitate Coordination........................................... 45

6.   Producers Have Similar Cost Structures........................................................ 46

E.   Defendants' Collusion Has Led to Unprecedented Profits................................... 46

F.   Members of Congress, Federal Enforcement Agencies, and Consumer
     Groups Have Raised Concerns That Soaring Prices of Conventional Eggs Are
     the Product of Collusion ........................................................................................ 47

G.   The Sharp, Parallel Drop in Prices Following Public Disclosure of the DOJ
     Investigation Further Indicates Collusion.............................................................. 49

H.   Several Defendant Egg Producers are Antitrust Recidivists Found Liable for
     Similar Anticompetitive Conduct in the Past......................................................... 51

I.   Multiple Plus Factors Reinforce the Plausibility of the Alleged Conspiracy ....... 52

1.   Parallel Conduct in Pricing and Capacity Reduction................................. 52

2.   A Market Structure and Benchmark System That Facilitates
     Coordination .................................................................................................... 53

3.      Opportunities to Collude...........................................................................53

4.      A History of Similar Anticompetitive Conduct.......................................53

5.      Government Scrutiny and Public Concern ...............................................54

6.      Sustained Supracompetitive Profits Inconsistent with Competition.........54

7.      Producer Defendants Acted Contrary to Their Independent Economic Self-Interest................................................................................................54

8.      Absence of a Regulated Futures Market Facilitated Collusion ................55

VI.      THE RELEVANT MARKET....................................................................................55

A.      The Relevant Product Market ..................................................................56

B.      Economic and Practical Indicia ...............................................................57

C.      The Relevant Geographic Market.............................................................58

VII.      DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET .......................59

VIII.      ANTICOMPETITIVE EFFECTS AND INTERSTATE COMMERCE..........................60

IX.      CLASS ACTION ALLEGATIONS ..........................................................................61

X.      CAUSES OF ACTION ...........................................................................................63

COUNT ONE  Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Antitrust Act..........................................................................................................63

COUNT TWO  Unlawful Information Exchange in Violation of Section 1 of the Sherman Antitrust Act..........................................................................................................65

XI.      PETITION FOR RELIEF ......................................................................................67

XII.      JURY TRIAL DEMAND .......................................................................................67

Plaintiffs C&L, LLC; Den-Tex Central, Inc.; Den-Tex Central II, Inc.; ToWin 6840, LLC; ToWin 6966, LLC; ToWin 8583, LLC; and ToWin 8872, LLC (together, "Plaintiffs") bring this civil antitrust action on behalf of themselves individually and on behalf of a proposed Class against Defendants Cal-Maine Foods, Inc.; Daybreak Foods, Inc.; Hillandale Farms of PA, Inc.; Hillandale-Gettysburg, LLC; Rose Acre Farms, Inc.; Opal Foods, LLC; Versova Holdings LLP (together, "Producer Defendants"); Urner Barry Publications, Inc. d/b/a Expana; Egg Clearinghouse, Inc.; and United Egg Producers d/b/a Egg Farmers of America.

## I.    INTRODUCTION

1.    This action challenges a multi-year conspiracy among the largest producers of Conventional Eggs[1] to fix, raise, maintain, and stabilize prices for shell eggs sold throughout the United States. Plaintiffs' preliminary economic analysis demonstrates that the skyrocketing egg prices seen during the conspiracy cannot be explained by competitive market forces like supply, demand, and costs and instead reflect coordinated manipulation of price formation and industry output.

2.    At the center of the scheme is the Urner Barry Market—the dominant pricing benchmark for Conventional Eggs in the United States. The Urner Barry Market functions as the *de facto* reference price for the overwhelming majority of Conventional Egg transactions in the United States, including both spot sales and long-term formula-priced contracts. Plaintiffs' economic study of publicly available data demonstrates a 97% correlation between the Urner Barry benchmark and observed egg prices during the Class Period. In a market where prices are mechanically tied to a single benchmark, coordinated manipulation of the benchmark is tantamount to price fixing.

3.    The Urner Barry Market is unusually susceptible to manipulation. Its daily benchmark is derived from (a) producer-submitted, non-public information about supply conditions, availability, and transactions; and (b) trades on the thinly traded Egg Clearinghouse, Inc. ("ECI") spot market, which represents only a small fraction of national egg sales but is heavily weighted in Urner Barry's

---

[1] "Conventional Eggs" refers to standard white or brown shell eggs produced in non-specialty housing systems (including traditional caged, enriched colony, and cage-free systems that are *not* specialty, organic, pasture-raised, or similarly differentiated). Conventional Eggs account for the vast majority of eggs sold in the wholesale market in the United States.

methodology. In such a structure, small shifts in reported data or limited-volume trades can move the entire industry's benchmark, causing nationwide price movements untethered to actual competitive conditions.

4. Beginning no later than 2022, Defendants orchestrated a coordinated scheme to inflate and sustain the Urner Barry benchmark by simultaneously (1) restricting output of Conventional Eggs and (2) manipulating the information on which Urner Barry's daily assessments are based. Because nearly all large producers price their eggs through formula contracts tied directly to the Urner Barry benchmark, coordinated conduct affecting the benchmark results in immediate, automatic, and uniform price increases across the market.

5. Plaintiffs' expert economist conducted multiple empirical analyses confirming that the magnitude and persistence of the price increases observed since 2022 cannot be explained by supply disruptions, input costs, or demand conditions. These preliminary analyses show that the relationship between egg prices and traditional economic drivers broke down during the Class Period, with prices rising far beyond levels predicted by historical patterns or standard supply-and-demand models.

6. For example, although feed costs—the primary input in egg production—remained relatively stable after a modest increase in 2022, egg prices increased by multiples far exceeding any cost-based justification. Similarly, while avian flu outbreaks reduced flock size modestly, the resulting supply impact was insufficient to account for the unprecedented price increases. Regression analyses controlling for feed costs, avian flu impacts, demand, and seasonality confirm that these factors do not explain the observed price behavior.

7. The industry's response to high prices was inconsistent with independent, profit-maximizing behavior. In competitive markets, elevated prices create strong incentives for firms to expand output. Here, however, Producer Defendants executed uniform and synchronized output-suppression strategies—including delaying flock repopulation after Highly Pathogenic Avian Influenza ("HPAI"), reducing chick placements, performing parallel cage-space transitions that limited usable barn capacity, refusing to activate idle or easily restorable facilities, and withholding eggs through cold-

2

storage practices. These reductions occurred during the most profitable period in industry history, when competitive firms acting independently would have been incentivized to rapidly expand production.

8. The timing and magnitude of price movements provide additional economic evidence of collusion. Prices began rising sharply in 2022 without corresponding changes in underlying market fundamentals and remained elevated for an extended period. Then, following public disclosure of an antitrust investigation by the U.S. Department of Justice in March 2025, prices fell abruptly and in parallel across the industry—declining far more rapidly than historical price volatility would predict. Plaintiffs' economist conducted an event-study analysis showing that this price decline was several multiples larger than expected under historic market conditions.

9. Producer Defendants' financial results confirm the conspiracy's effects. Throughout the Class Period, Producer Defendants reported extraordinary, historically unprecedented profits and margins, far exceeding any increases in feed, energy, labor, or other production costs. These windfall profits persisted only because Defendants restrained output and jointly inflated the benchmark that sets the price for Conventional Eggs nationwide.

10. Plaintiffs and members of the Class purchased Conventional Eggs directly from one or more Producer Defendants at prices artificially increased by Defendants' unlawful agreement. Plaintiffs seek treble damages, injunctive relief, and all other appropriate remedies under federal antitrust law to restore competition to the U.S. market for Conventional Eggs.

## II.    PARTIES

### A.    Plaintiffs

11. Plaintiffs are Denny's, Inc. franchisees who are among the most significant purchasers of Conventional Eggs in United States foodservice. Collectively, Plaintiffs operate Denny's, Inc. franchises in Illinois, Kansas, Missouri, Oklahoma, Texas, and Arkansas. As America's iconic 24-hour breakfast chain, shell eggs are a key, indispensable input to a Denny's franchise. The company's menu is centered on all-day breakfast offerings that prominently feature eggs, including omelets, scrambles, fried egg platters, and signature dishes such as the "Grand Slam" and "Moons Over My Hammy."

12.    Plaintiffs are owned by Dawn Lafreeda, the largest single-owner Denny's franchisee in the nation. Having started as a Denny's hostess at age 16, Lafreeda purchased her first franchise at age 23, and has since amassed over 75 restaurants in her portfolio, collectively employing over 3,000 people. Lafreeda has been recognized for her business success with over 70 awards, including the Denny's Operator of the Year, the Women's Business Owner of the Year award from the National Association of Women Business Owners, and the CEO Ambassador Award from Denny's in 2023. Lafreeda has served as the Director & Treasurer of the Board for the Denny's Franchisee Association as well as a member of several Denny's corporate organizations, including the Development Brand Advisory Council and the Corporate Social Responsibility Committee. Lafreeda has also been featured in *Forbes' 50 Over 50* list as well as in the documentary *Show Her the Money*, which highlights the unique challenges that female entrepreneurs face.

13.    Plaintiff C&L, LLC ("C&L") is a limited liability company organized under the laws of Texas that operates Denny's Inc. franchises located in Texas. C&L purchased Conventional Eggs from Kimball & Thompson Produce Company ("K&T"). K&T purchased Conventional Eggs directly from one or more Defendants and assigned its claim to C&L.

14.    Plaintiff Den-Tex Central, Inc. ("Den-Tex Central") is a corporation organized under the laws of Texas that operates Denny's Inc. franchises located in Illinois, Kansas, Missouri, Arkansas, Texas and Oklahoma. Den-Tex Central purchased Conventional Eggs from K&T. K&T purchased Conventional Eggs directly from one or more Defendants and assigned its claim to Den-Tex Central.

15.    Plaintiff Den-Tex Central II, Inc. ("Den-Tex Central II") is a corporation organized under the laws of Texas that operates Denny's Inc. franchises located in Missouri. Den-Tex Central II purchased Conventional Eggs from K&T. K&T purchased Conventional Eggs directly from one or more Defendants and assigned its claim to Den-Tex Central II.

16.    Plaintiff ToWin 6840, LLC ("ToWin 6840") is a limited liability company organized under the laws of Oklahoma that operates Denny's Inc. franchises located in Oklahoma. ToWin 6840 purchased Conventional Eggs from K&T. K&T purchased Conventional Eggs directly from one or more Defendants and assigned its claim to ToWin 6840.

4

17.     Plaintiff ToWin 6966, LLC ("ToWin 6966") is a limited liability company organized under the laws of Oklahoma that operates Denny's Inc. franchises located in Oklahoma. ToWin 6966 purchased Conventional Eggs from K&T. K&T purchased Conventional Eggs directly from one or more Defendants and assigned its claim to ToWin 6966.

18.     Plaintiff ToWin 8583, LLC ("ToWin 8583") is a limited liability company that operates Denny's Inc. franchises located in Arkansas. ToWin 8583 purchased Conventional Eggs from K&T. K&T purchased Conventional Eggs directly from one or more Defendants and assigned its claim to ToWin 8583.

19.     Plaintiff ToWin 8872, LLC ("ToWin 8872") is a limited liability company that operates Denny's Inc. franchises located in Texas. ToWin 8872 purchased Conventional Eggs from K&T. K&T purchased Conventional Eggs directly from one or more Defendants and assigned its claim to ToWin 8872.

**B.     Defendants**

**1.     Cal-Maine**

20.     Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located at 1052 Highland Colony Parkway, Suite 200, Ridgeland, Mississippi, 39157.

21.     Cal-Maine was founded in 1957. Today, it is the largest producer and marketer of Conventional Eggs in the United States. It operates 49 shell egg production plants, which house up to 51.8 million layer hens. Cal-Maine processes and packages approximately 674,700 dozen shell eggs per hour.

22.     In 2023, Cal-Maine achieved record sales of $3.15 billion with over 1.15 billion dozens sold.

5

23.     In July of 2024, Cal-Maine purchased ISE America, a top-25 shell egg producer, in what was Cal-Maine's 25th acquisition since 1989. Cal-Maine credits its success to, *inter alia*, its "disciplined acquisition strategy."[2]

24.     Cal-Maine is also known for being wholly vertically integrated. In a 2025 investor presentation, Cal-Maine explained that "[f]ully integrated operations allow for scaled production and distribution capacity."[3] It owns breeding facilities, hatcheries, feed mills, and more.

### 2.     Daybreak

25.     Defendant Daybreak Foods, Inc. ("Daybreak") is a Wisconsin corporation, with its offices and principal place of business located at 533 E Tyranena Park Road, Lake Mills, Wisconsin, 53551.

26.     Founded in 1967, Daybreak is now among the country's largest Conventional Egg producers. Daybreak operates farms in five states; these farms are home to more than 24 million laying hens. Daybreak produces about 16 million eggs per day.

### 3.     Hillandale Farms

27.     Defendants Hillandale Farms of PA, Inc. and Hillandale-Gettysburg, LLC are part of an integrated egg production enterprise that produces, sells, and markets Conventional Eggs (collectively, "Hillandale Farms").

28.     Defendant Hillandale Farms of PA, Inc. is a corporation organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 3rd & Crooked Run Road, North Versailles, Pennsylvania, 15137.

29.     Defendant Hillandale-Gettysburg, LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 3910 Oxford Road, Gettysburg, Pennsylvania, 17325.

---

[2] Cal-Maine Foods, "Our History," https://www.calmainefoods.com/history (last visited Apr. 15, 2025).
[3] Cal-Maine Foods, "2Q 2025 Investor Presentation" (Jan. 2025), available at https://irp.cdn-website.com/79e86203/files/uploaded/CALM_FY25_2Q_Investor_Presentation_Accessible.pdf.

30.     Hillandale Farms raises over 20 million hens for egg production. It produces shell eggs and egg products, along with butter and cheeses.

31.     Hillandale Farms's market area spans from the Dakotas to the East Coast. The company has four production facilities, in Ohio, Pennsylvania, and Delaware. In 2022, it reported an annual revenue in excess of $800 million.

32.     Hillandale Farms is a vertically integrated entity. It touts itself as being "directly involved in every aspect of egg production and distribution."[4]

33.     Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion. Global Eggs, which is operated by Brazil's "Egg King" Ricardo Faria, is the world's second largest egg producer, with 93 farms across 3 continents and over 13 billion eggs produced annually.

### 4.    Rose Acre

34.     Defendant Rose Acre Farms, Inc. ("Rose Acre") is a corporation organized, existing, and doing business under the laws of the State of Indiana, with its offices and principal place of business located at 1657 W Tipton Street, Seymour, Indiana, 47274.

35.     Founded in the 1930s, Rose Acre is now among the largest Conventional Egg producers in the United States. It produces shell eggs, specialty eggs, liquid eggs, dried eggs, and egg protein powder. Rose Acre operates sixteen farms in seven states, and employs an estimated 2,400 workers.

### 5.    Opal Foods, LLC

36.     Defendant Opal Foods, LLC ("Opal Foods") is a limited liability company with its offices and principal place of business located at 16194 Highway 59, Neosho, Missouri 64850.

37.     Opal Foods is a producer of Conventional Eggs and, since 2020, has operated as a joint venture owned by Rose Acre and Weaver Brothers, Inc.

---

[4] Hillandale Farms, Press Release: "Hillandale Farms Appoints Kevin Jackson Chief Executive Officer" (July 28, 2022), https://www.globenewswire.com/news-release/2022/07/28/2487513/0/en/Hillandale-Farms-Appoints-Kevin-Jackson-Chief-Executive-Officer.html.

38.    Opal Foods has acquired other producers of Conventional Eggs, including Sparboe Farms, Inc. In 2021, the Minnesota Attorney General accused Sparboe of price-gouging during the COVID-19 pandemic and alleged that Sparboe "almost exclusively ties the sale prices of its eggs" to the Urner Barry benchmark.[5]

**6.    Versova Holdings LLP**

39.    Defendant Versova Holdings LLP ("Versova") is a limited liability partnership organized under the laws of Iowa, with its offices and principal place of business located at 241 St. Andrews Way, Sioux Center, Iowa, 51250.

40.    Versova is a holding company of seven family farms located in seven states. It employs over 2,000 workers and produces almost 8 billion eggs per year. Versova is one of the largest producers of Conventional Eggs in the United States.

41.    In 2025, Versova Holdings transitioned to become an agricultural cooperative, now operating under the name Versova Management Cooperative.

**7.    Urner Barry Publications, Inc. d/b/a Expana**

42.    Defendant Urner Barry Publications, Inc. d/b/a Expana is a corporation organized, existing, and doing business under the laws of the State of New Jersey, with its offices and principal place of business located at 1001 Corporate Cir, Toms River, New Jersey, 08755.

43.    With a history tracing back to price circulars in the 1850s, Urner Barry is the leading provider of pricing intelligence to the poultry, egg, meat, and seafood industries.

44.    In 2000, Urner Barry created COMTELL ("Commodity Intelligence"), which it calls "the most accessible, accurate and timely source for news, quotes and research" in several food-related industries, including eggs.[6] COMTELL subscribers "are updated several times a day on the most impactful market conditions."[7] This includes daily benchmark assessments for shell eggs, including the Midwest Large quotation, which serves as the primary reference price for formula-priced transactions.

---

[5] First Am. Compl. ¶49, *State of Minnesota v. Sparboe Farms, Inc.*, Case No. 27-cv-21-10810 (Mn. Ct., Hennepin Cnty. 2021), available at https://www.ag.state.mn.us/Office/Communications/2021/docs/Sparboe_Complaint.pdf.
[6] Urner Barry, "Our History," https://www.urnerbarry.com/OurHistory (last visited Apr. 15, 2026).
[7] Urner Barry, "Market Prices," https://www.comtell.com/Marketing/Market-Prices (last visited Apr. 15, 2026).

8

45.     Urner Barry was previously a subsidiary of AgriBriefing Limited, which was acquired by the U.K.-based Mintec Group in 2023. In 2024, the Mintec Group consolidated all of its operations under the brand "Expana."

46.     The Producer Defendants are all users of Urner Barry.

**8.     Egg Clearinghouse, Inc.**

47.     Defendant Egg Clearinghouse, Inc. is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located at 122 Broadway, Dover, New Hampshire, 03820.

48.     ECI describes itself as an "exchange to help determine and establish the market value for eggs and egg products."[8] It operates the only online spot market that allows members (farmers and egg buyers) to bid on eggs listed for sale.

49.     In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more than $600 million, were traded on the ECI online platform.

50.     ECI data feeds directly into Urner Barry.

**9.     United Egg Producers**

51.     Defendant United Egg Producers d/b/a Egg Farmers of America ("UEP") is a corporation organized, existing, and doing business under the laws of the State of Maine, with its offices and principal place of business located at 6455 East Johns Crossing, Suite 410, Johns Creek, Georgia, 30097.

52.     UEP is a national cooperative of egg farmers representing the ownership of approximately 11 out of every 12 eggs produced in the United States. It is a policy and lobbying organization that works to "address legislative, regulatory and advocacy issues impacting egg production."[9] UEP says that its members "directly guide the future of egg farming."[10]

---

[8] Egg Clearinghouse, Inc., https://www.eggs.org/ (last visited Apr. 15, 2026).
[9] United Egg Producers, "About," https://unitedegg.com/about/ (last visited Apr. 15, 2026).
[10] *Id.*

9

53.     UEP formed the United Egg Association ("UEA") in 1983. UEA serves as a national trade association for egg producers and packers, further processors, and allied members. It also operates EGGPAC, a political action committee.

### III.     AGENTS AND CO-CONSPIRATORS

54.     Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance thereof. The identity of all co-conspirators is unknown at this time and will require discovery.

55.     The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

56.     Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

57.     Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

58.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Defendants are jointly and severally liable for the acts of these co-conspirators, whether or not they are named as Defendants in this Complaint.

59.      Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

60.     When Plaintiffs refer to a corporate family or companies by a single name in alleging participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Because Defendants market themselves as corporate families, individual

10

participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices of Conventional Eggs.

## IV.    JURISDICTION AND VENUE

61.    This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26). Plaintiffs seek treble damages for their injuries, and those suffered by members of the proposed Class, resulting from Defendants' anticompetitive conduct; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States.

62.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and § 1337(a) (antitrust), as well as 15 U.S.C. § 15 (antitrust). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a state different from that of each Defendant.

63.    This Court has personal jurisdiction over all of the Defendants because each of them transacted business, maintained substantial contacts, and committed acts in furtherance of the alleged antitrust conspiracy in this District, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

64.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because certain unlawful acts by the Defendants were performed in this District, and because a substantial portion of interstate commerce affected by the conspiracy alleged herein occurred in this District.

## V.    FACTUAL ALLEGATIONS

**A.    Background on Eggs**

### 1.    Eggs Are a Vital Consumer Good

65.    Eggs are an essential staple in the kitchens of a vast majority of U.S. households.

66.    The U.S. Department of Agriculture has described eggs as "among the most nutritious foods on earth."[11] As reported by the American Heart Association, "eggs are an efficient, rich source of protein and vitamins" and are linked to promoting healthy metabolism, liver function, and fetal brain development.[12]

67.    Eggs and egg products may be cooked and eaten directly or consumed after being incorporated into various foods like baked goods and mayonnaise.

68.    Due largely to their nutritional value and their versatility in cooking, eggs are a fundamental food staple in 93% of U.S. households. More than 4 in 5 Americans "always" keep eggs in their fridge.

69.    The government estimated that, in 2024, residents of the United States consumed over 284 eggs per year per person.

70.    Egg consumption remains comparatively steady. This is because demand for eggs is relatively inelastic—that is, consumers do not purchase fewer eggs when prices rise. There are no substitutes for eggs; purchasers cannot switch to other products to make the price increase unprofitable for producers.

### 2.    The United States Egg Market

71.    According to an industry analyst, the egg market in the United States is worth approximately $10 billion annually.

72.    Defendants market and sell their eggs throughout the United States and compete with each other in the national market. Food products such as eggs are regulated on a national scale, such that

---

[11] U.S. Dep't of Agriculture, Food Safety & Inspection Serv., "Shell Eggs from Farm to Table," available at https://www.fsis.usda.gov/food-safety/safe-food-handling-and-preparation/eggs/shell-eggs-farm-table (last visited Apr. 15, 2026).

[12] Am. Heart Ass'n, "Are Eggs Good for You or Not?" (Aug. 16, 2018), https://www.heart.org/en/news/2018/08/15/are-eggs-good-for-you-or-not.

Defendants would not be constrained by regional or statewide geographic factors in selling products to customers like Plaintiffs.

73.     U.S. table egg production totaled 92.6 billion eggs in 2022, a 3% decrease from 2021. The U.S. had 308 million commercial laying hens at the end of 2022, down 4.5% from 2021. The daily rate of lay averaged 82 eggs per 100 layers in 2022. On average, each laying hen produces 300 eggs per year.



74.     Egg production is a significant contributor to the economy and employment in several states. The five largest shell egg-producing states are home to approximately 44% of all laying hens in the U.S., and the top 10 states comprise more than 65% of egg production.

13



75.     Of the 261 million cases of eggs produced in 2022, more than half were sold as shell eggs through retail outlets. Over one-fourth of eggs produced were further processed into products for food service, manufacturing, retail, and export. The vast majority of U.S. egg production is consumed domestically, with under 160.8 million (table eggs plus egg products in shell egg equivalent) eggs exported in 2022.

14



76.     Egg production in the United States has traditionally been a low margin industry, meaning that profit levels were low but steady. That has recently changed.

### 3.     The Conventional Eggs Market

77.     The domestic egg sector consists primarily of "table eggs," which are shell eggs sold for direct consumer consumption. As the industry puts it: "Envision any all-American egg, just waiting to get cracked. That's a shell egg."[13] The overwhelming majority of shell eggs produced in the United States fall into the category of **Conventional Eggs**—standard white or brown eggs produced in non-specialty systems and sold through retail and foodservice channels.

78.     Conventional Eggs are distinct from specialty eggs such as cage-free, organic, free-range, or pasture-raised eggs. Specialty eggs represent a minority of total production and are sold at premium prices based on specific animal-welfare, environmental, or certification standards. By contrast,

---

[13] United Egg Producers, "Facts & Stats," https://unitedegg.com/facts-stats/ (last visited Apr. 15, 2026).

Conventional Eggs are the industry standard product and constitute the vast bulk of all eggs sold in the United States.

79.    The egg industry is highly vertically integrated. Most large producers—including the Producer Defendants—control nearly every stage of production, from breeding and hatching to feeding, housing, husbandry, processing, packaging, and marketing. This vertical control gives producers substantial visibility into the supply decisions of their competitors and significant discretion over the volume of Conventional Eggs produced.

80.    Several Producer Defendants operate their own hatcheries and produce their own layer-hen stock. For example, Cal-Maine can hatch more than 600,000 chicks per week. Other producers obtain day-old chicks from commercial hatcheries, but still raise them internally through the pullet and laying cycles.

81.    Young female chickens, known as pullets, are grown in pullet facilities until roughly 18 weeks of age. At maturity, pullets are transferred to laying facilities, where they begin producing eggs. Peak egg production generally occurs between 30 and 32 weeks of age.

82.    As hens age, egg production declines. When production falls to approximately 50 percent—typically around 60 to 70 weeks of age—producers may choose to molt the flock. Molting halts egg production for roughly eight weeks while hens regrow feathers, after which production temporarily increases. Molting therefore reduces short-term supply but can extend the productive life of a flock.

83.    Hens may be molted a second time before ultimately becoming "spent hens." Spent hens, typically between 100 and 130 weeks old, are depopulated once they can no longer produce eggs at profitable levels.

84.    Shell eggs are collected on belts and transported to storage coolers or egg-processing centers. Eggs usually reach a processing center within twelve to fourteen hours after laying, where they are washed, inspected for cracks or defects, graded, and packaged for sale or further processing.

85.    In addition to producing table eggs, Producer Defendants also produce "breaking eggs," which are sold into the egg-products sector.

16

86. The egg-products sector includes dried, frozen, and liquid egg products that have been removed from their shells and processed through breaking, filtering, blending, pasteurizing, cooling, freezing, drying, and packaging.

87. Products such as Egg Beaters®, sugared yolks, frozen egg patties, and peeled hard-boiled eggs are examples of processed egg products commonly sold in food manufacturing, foodservice, and retail channels.

### 4. Conventional Eggs Are a Commodity Product

88. Conventional Eggs are considered a commodity product because they are highly interchangeable. The Conventional Eggs produced and tracked by Defendants are nearly identical in terms of quality, appearance, and use. This makes them fungible in the eyes of customers and indirect consumers. Government grading standards make all Conventional Eggs functionally equivalent.

89. As the U.S. Department of Justice has explained: "The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure."[14]

90. Conventional Eggs are commodities that are reasonably interchangeable by consumers for the same purposes.

91. This is especially true in the market for Conventional Eggs, as many producers market their eggs under the same brands like Eggland's Best, such that it is difficult for a consumer to determine which company actually produced the eggs.

92. As interchangeable commodity products, Conventional Eggs are differentiated almost exclusively based on price.

### 5. Conventional Egg Production is Dominated by Producer Defendants and Consolidating

93. Producer Defendants are among the largest Conventional Egg producers in the country.

94. In 1982, half of all egg-laying hens lived on farms with 62,000 hens or less. By 2012, half of all hens lived on farms with 925,000 hens or more.

---

[14] *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*, UNITED STATES DEPARTMENT OF JUSTICE: ANTITRUST DIVISION, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf (last updated Feb. 2021).

95.   Egg production has been consolidating even more quickly in recent years, making anticompetitive coordination easier. Between January 2023 and January 2025, the top five egg producers' share of the U.S. layer hen flock grew from 37% to 46%.

96.   In 2023 alone, Cal-Maine acquired Fassio Egg Farms, while Daybreak Foods acquired Hen Haven LLC and Schipper Eggs LLC, and MPS Egg Farms (the sixth-largest egg producer) acquired Country Charm Eggs.

97.   Today, the largest Conventional Egg producer, Cal-Maine, has significantly more hens than its next largest competitor and controls a large chunk of the market.



98.   Cal-Maine, which is the only public company among the Producer Defendants, is clear about its focus on a growth strategy through acquisition in its investor materials, emphasizing the importance of a "[s]teady flow of M&A opportunities."[15]

99.   Industry analysts expect consolidation to continue.

100.   According to an industry publication, as of 2025, Cal-Maine had 50.61 million layer hens, Rose Acre had 25.5 million, Daybreak had 23.3 million, Hillandale had 18.34 million, and Versova had more than 20 million.

---

[15] Cal-Maine Foods, "Investor Presentation Q4 FY2025" (July 2025), available at https://irp.cdn-website.com/79e86203/files/uploaded/CALM_FY25_2Q_Investor_Presentation_Accessible.pdf.

**6.**        **The Price of Conventional Eggs Has Skyrocketed Since 2022**

101.    The wholesale price of Grade-A, Large, White, Shell Eggs surged from around $0.50–$1.30 per dozen in 2021 to $1.50–$5.00 per dozen in 2022. This represents a 200-285% increase.

102.    While there was a dip in 2023, prices began climbing again by August 2024, reaching $3.00–$6.00 per dozen by the end of the year.



103.    The Urner Barry Egg Index, described below, reflects the same unprecedented trend.



19

104. As of February of 2025, the national index of weekly prices for Grade-A, Large eggs had risen to $7.00–$9.00 per dozen. The national average cost of a dozen Large, white shell eggs was $8.07. These are pricing levels that have never before been seen in the egg industry.

**7.    Industrywide Conventional Egg Prices Are Set by "Formula Pricing" that Has Significant, Confidential Input from Producer Defendants**

105. The vast majority of Conventional Egg sales in the United States are made under contracts between egg producers and their customers, including retailers, distributors, and foodservice companies.

106. These contracts frequently use formula pricing, under which the price for each shipment or transaction is tied directly to an external benchmark quotation. Once the parties agree on the formula, contract prices fluctuate automatically with movements in the benchmark.

107. Formula pricing has long been recognized as a vulnerability in commodity markets. When a market is dominated by a small number of large producers and transactions are tied to a single benchmark, producers have both the incentive and the ability to influence the benchmark price through coordinated changes in their conduct.

108. In the Conventional Egg market, formula prices are typically based on quotations issued by Urner Barry (now known as Expana). Urner Barry publishes daily benchmark assessments for shell eggs, including the Midwest Large quotation, which serves as the primary reference price for formula-priced transactions.

109. Urner Barry incorporates various sources of market information into its assessments, including data derived from the spot market operated by Egg Clearinghouse, Inc. ("ECI"), the sole venue for spot egg trading in the United States.

110. The spot egg market is atypical among agricultural commodities. Unlike markets for hogs, corn, wheat, soybeans, cattle, and nearly all other agricultural products—which have multiple trading venues and deep, competitive spot markets—the ECI spot market is the *only* national platform for spot egg transactions, and its pricing feeds directly into the Urner Barry benchmark. As a result,

20

movements in ECI pricing have an outsized impact on the benchmark prices used in formula contracts throughout the industry.

### i. Egg Clearinghouse, Inc.

111.    ECI is the primary—if not the only—national spot market for eggs in the United States. For decades, ECI has functioned as the central venue for the limited number of spot transactions that occur in the shell egg industry, and it is widely recognized as the sole organized spot exchange for shell eggs nationwide.

112.    ECI was established in or around 1971 after both the New York Mercantile Exchange and the Chicago Mercantile Exchange ceased egg trading due to declining volumes and persistent concerns over thin liquidity. With the closure of those exchanges, there was no centralized venue for discovering spot prices. ECI was created to fill that vacuum, providing a single platform through which producers and processors could post offers, solicit bids, and execute sporadic spot trades.

113.    ECI was founded by Fred R. Adams Jr., the longtime chief executive of Cal-Maine. Since its formation, ECI's governance has been dominated by egg-industry participants, including producers and processors with substantial commercial interests in egg pricing. Adams served on ECI's board for many years, as did his successor at Cal-Maine, Adolphus Baker. This executive overlap has historically ensured that the nation's largest egg producers maintained direct influence over the operation of the only spot market for eggs.

114.    A 1978 market study analyzing ECI identified several structural features that made the exchange vulnerable to manipulation. It observed that ECI's membership consisted primarily of producers and processors, many of whom shared an interest in achieving the "highest possible quotation" to increase profits.[16] The study further warned that members could "bid higher on ECI than current market conditions would warrant" and, because ECI's volume represented "less than 1% of all eggs produced," such bids could nevertheless elevate the benchmark prices used throughout the

---

[16] Gene Newsom, *Egg Pricing in a Thin Market* at 52 (1978), available at
https://ageconsearch.umn.edu/record/303075?v=pdf.

industry.[17] The study noted that ECI pricing was particularly susceptible to distortion because members could bid up prices "when there are no eggs offered without fear of receiving a load,"[18] allowing price increases to occur faster than justified by actual supply-and-demand conditions.

115.    These vulnerabilities persist today. ECI conducts only a small number of trades relative to national egg production. Despite this thin volume, ECI acknowledges that its "trading levels . . . help determine prices on the wholesale level,"[19] and ECI's posted trades are widely viewed as influential inputs into the Urner Barry assessments that form the basis for formula pricing across the industry.

116.     ECI operates a proprietary online auction platform in which registered members may post offers, place bids, and view trade results. Trading is conducted using a "blind bidding" process in which participants do not know one another's identities until after a trade is executed. The exchange publishes summaries of completed trades, including price, quantity, and delivery region. Although ECI does not itself produce eggs, its auction results are treated as a key source of "price discovery" for the entire industry.

117.    ECI's board of directors continues to include executives from major egg producers. Current directors include Matt Arrowsmith of Cal-Maine, John Grominski of Hillandale, and Mike Bowman of Versova. Only ECI members—typically producers, processors, and certain institutional buyers—are permitted to trade. Because ECI is the industry's only organized spot market and because its reported trades are incorporated into the Urner Barry Market, coordinated behavior among producers on or around the ECI exchange can have direct and immediate effects on benchmark egg prices throughout the United States.

### ii.    The Urner Barry Benchmark for Conventional Eggs

118.    Urner Barry, now part of Mintec's Expana family of brands, publishes the benchmark price assessments used throughout the United States for Conventional Eggs. Urner Barry's quotations

---

[17] *Id.* at 52-53.
[18] *Id.* at 53.
[19] Egg Clearinghouse, Inc., https://www.eggs.org/ (last visited Apr. 15, 2026).

are treated as the industry standard for evaluating wholesale market conditions and pricing Conventional Eggs in commercial transactions.

119. Urner Barry sells access to its pricing data through its proprietary platform COMTELL, which publishes daily benchmark quotations for several categories of shell eggs, including the Midwest Large Conventional Egg quotation, which is the most influential benchmark in the domestic market.

120. The Midwest Large Conventional Egg quotation is the dominant reference point in the industry because it serves as the base formula price in a substantial percentage of contracts between Conventional Egg producers and their customers. Once parties agree to a formula referencing Urner Barry's Midwest Large benchmark, the price for each shipment moves automatically with Urner Barry's daily assessments.

121. Urner Barry relies on two primary sources of information to generate its benchmark quotations for Conventional Eggs.

122. First, it incorporates quantitative trading data from ECI the industry's sole organized spot market for shell eggs. Urner Barry has described ECI trades as its only objective, numeric inputs for the Conventional Egg market. Urner Barry typically includes only those ECI trades involving egg producers with more than one million layers, because these transactions are viewed as more representative of commercial-scale Conventional Egg production. As a result, even a small number of ECI trades—if placed at elevated or depressed prices—can exert a material influence on Urner Barry's benchmark for Conventional Eggs.

123. Second, Urner Barry's Conventional Egg assessments are informed by qualitative, non-public information obtained directly from industry participants. These communications include private calls and discussions with major Conventional Egg producers, distributors, retailers, and foodservice buyers. Urner Barry gathers market sentiment, available volume, delivered pricing, and perceived tightness or looseness in supply from these participants.

124. Because these qualitative inputs depend heavily on what producers choose to report, the Producer Defendants possess significant influence over the benchmark. Through coordinated supply

behavior or coordinated messaging about market conditions, the Defendants can shape the narrative that Urner Barry relies upon when forming its Conventional Egg assessments.

125.    Urner Barry publishes its Conventional Egg quotations each business day, usually in the late afternoon. Information gathered after the release of a given day's report is incorporated into the following day's assessment.

126.    The daily nature of Urner Barry's process means that changes in ECI trading, reported availability, or producer-submitted information can affect benchmark prices for Conventional Eggs within twenty-four hours. This gives the Producer Defendants the practical ability to cause immediate increases or decreases in the benchmark price used in formula contracts throughout the market.

127.    The Urner Barry benchmark for Conventional Eggs has an outsized impact on national egg prices because so many commercial transactions reference it directly. Even small movements in the Midwest Large benchmark can significantly increase purchasers' total egg spend, and sustained upward movements translate into substantial overcharges across the industry.

128.    As a result, the combination of a single spot market (ECI), limited quantitative price discovery, reliance on confidential producer reports, and widespread formula pricing makes the Conventional Egg market particularly vulnerable to coordinated supply restrictions and benchmark manipulation.

**B.    Defendants' Coordinated Scheme to Inflate the Price of Conventional Eggs**

129.    Defendants' scheme to raise and stabilize the price of Conventional Eggs operated through two coordinated components: (1) manipulating the benchmark price by supplying information to Urner Barry and trading on the Egg Clearinghouse, Inc. ("ECI") spot market; and (2) restricting industry capacity to ensure that elevated benchmark prices persisted.

**1.    Manipulation of the Urner Barry Benchmark**

130.    The price of Conventional Eggs in the United States is determined largely by a single benchmark: the Urner Barry Midwest Large quotation. The Urner Barry benchmark serves as the base price in a substantial share of formula-priced contracts between producers and commercial buyers.

131.     To evaluate the economic role of the Urner Barry benchmark, Plaintiffs retained an expert economist to conduct a quantitative analysis of the relationship between benchmark movements and observed egg prices. Using publicly available data, the expert compared the Urner Barry benchmark to the Producer Price Index ("PPI") for shell eggs—a widely accepted, independent measure published by the Bureau of Labor Statistics that tracks changes in prices received by producers over time.



132.     Plaintiffs' expert's analysis demonstrates an extraordinarily tight statistical relationship between the two series, with a correlation of approximately 97% over the Class Period. In economic terms, this level of correlation indicates that the benchmark operates as a centralized price-setting mechanism: when the benchmark rises or falls, market prices move in lockstep. In a market structured around formula pricing, coordinated influence over the benchmark therefore results in coordinated price increases across the industry, regardless of underlying supply-and-demand conditions.

133.     Due to its widespread adoption, movements in the Urner Barry benchmark therefore affect the price of billions of Conventional Eggs sold nationwide.

134.     No individual producer could elevate benchmark prices on its own. Because Producer Defendants collectively control a substantial portion of Conventional Egg production, the scheme required participation by the major producers.

135. It would not be rational for a producer acting independently to restrict output during a period of elevated prices. The uniform adoption of output-limiting practices by Defendants is inconsistent with independent conduct.

136. To generate its benchmark, Urner Barry collects non-public, confidential information from producers with more than one million hens, including through calls, interviews, electronic communications, and messaging.

137. Urner Barry also incorporates trading data from ECI, the only organized spot market for shell eggs in the United States. ECI trades are the only quantitative price inputs included directly in Urner Barry's Conventional Egg assessments.

138. Urner Barry does not require documentary verification for information submitted by producers. The identities of specific submitters and their submissions are not publicly disclosed.

139. Public officials have recognized the vulnerability of this system. As Senator Jack Reed observed, major producers "have the ability to feed data into the [Urner Barry] index that could result in beneficial pricing for the industry."[20]

140. Courts have likewise noted that benchmark systems relying on voluntary submissions by market participants are susceptible to coordinated influence. *See, e.g.*, *In re LIBOR-Based Financial Instruments Antitrust Litigation,* 823 F.3d 759, 771 (2d Cir. 2016).

141. Producer Defendants have significant input into the benchmark price through both their communications with Urner Barry and their trading activity on ECI. Because many transactions reference the benchmark, Producer Defendants' prices move together when the benchmark rises.

142. Concerns about the relationship between producers and Urner Barry are longstanding. In prior litigation involving broiler chickens, plaintiffs alleged that producers used a senior Urner Barry executive to communicate and enforce production limits that resulted in higher benchmark prices.

---

[20] Press Release: "Reed: Industrial Egg Producers Price Hikes Are Suspiciously High & Federal Government Should Help Rein in Unfair Market Practices" (Feb. 6, 2023), https://www.reed.senate.gov/news/releases/reed-industrial-egg-producers-price-hikes-are-suspiciously-high-and-federal-government-should-help-rein-in-unfair-market-practices.

26

143. Industry observers have similarly noted that reliance on a single price-discovery mechanism can "amplify" price movements and make benchmark pricing susceptible to influence by large-volume producers.

144. The existence of a benchmark pricing system does not immunize coordinated price fixing. Where, as here, competitors jointly influence the benchmark, exchange forward-looking sensitive information, and simultaneously take supply-restricting actions to ensure the benchmark remains elevated, benchmark pricing is itself a mechanism for, not a defense to, collusion.

145. Producer Defendants also exert influence over ECI. They are among the most active buyers and sellers on ECI, and executives from several Producer Defendants serve on ECI's board of directors.

146. ECI has several structural characteristics that make it susceptible to coordinated behavior, including a small number of sellers relative to buyers, limited trading volume, broad influence through incorporation into the benchmark, opacity, and the absence of futures-market oversight.

147. Producers have no obligation—and no economic incentive—to reflect true supply conditions or genuine competitive pricing in ECI bids or offers. Because ECI volume is thin and trades need not reflect meaningful commercial quantities, producers can use ECI strategically to influence benchmark prices at low cost.

148. **Low volume.** Sales on ECI represent approximately **5%** of total egg sales in the United States. This low volume makes ECI susceptible to manipulation because a few larger sellers, and a small number of trades, can create a significant shift in prices for the entire industry.

149. **Broad price influence via Urner Barry.** Despite representing only a small fraction of national volume, ECI prices are incorporated into the Urner Barry benchmark. As a result, influencing ECI pricing requires coordination on a relatively small number of trades, but because ECI pricing feeds directly into the benchmark, the effects extend to the broader market.

150.    **Opacity.** ECI is described as "little known outside the industry."[21] As *The Wall Street Journal* has observed, "Egg trading is unique. Prices for hogs, corn, wheat, soybeans, cattle and even boxes of frozen beef trade on markets run by CME Group. Few major food commodities rely on a little-known exchange service to determine their value."[22] Only ECI members are permitted to trade. Within the platform, bids are blind, and buyers only learn the seller's identity after a trade closes. The blind-bidding system and limited transparency make coordinated conduct difficult to detect.

151.    **Lack of futures-market oversight.** Unlike other food-related commodities—including wheat, soybeans, pork, and cattle—Conventional Eggs do not trade on a regulated futures exchange such as the CME. The absence of a futures market means there is no participation by financial intermediaries and no oversight by the Commodity Futures Trading Commission ("CFTC"). As one Bloomberg commentator noted, "There aren't any egg futures, and only 5% of eggs trade on a specialized spot market, the Egg Clearinghouse, Inc. This is an important reason for the wild price swings and market dislocations."[23] Futures markets provide capital, transparency, and regulatory scrutiny. Without CFTC oversight, ECI prices are more vulnerable to manipulation.

152.    Because the benchmark price for Conventional Eggs depends heavily on ECI trades and producer submissions, and because Defendants collectively dominate both channels, Defendants have the ability to influence the benchmark directly.

153.    The combination of a single benchmark, limited quantitative price discovery, confidential producer submissions, and concentrated trading activity on ECI makes benchmark prices for Conventional Eggs particularly vulnerable to coordinated conduct by Defendants.

### 2.    Restriction of Industry Capacity to Ensure that Elevated Prices Persisted

154.    In addition to influencing the benchmark pricing mechanism, Defendants also restricted production capacity to ensure that elevated prices for Conventional Eggs persisted.

---

[21] Patrick Thomas, *At the 'Wall Street of Eggs,' Demand Is Surging*, Wall Street J. (Feb. 18, 2025), https://www.wsj.com/business/retail/egg-industry-prices-shortage-clearinghouse-54435e03.
[22] *Id.*
[23] Aaron Brown, *Computing Power Is Going the Way of Oil Markets*, Bloomberg (Feb. 24, 2025), https://www.bloomberg.com/opinion/articles/2025-02-24/computing-power-is-going-the-way-of-oil-in-markets.

155.    Defendants have long known that capacity and price are closely linked. In prior antitrust litigation involving many of these same producers, evidence showed that they had previously coordinated to reduce supply in order to raise prices.

156.    During the Class Period, Producer Defendants again restricted supply through multiple mechanisms, including changes in cage-space allowances and the manipulation of production schedules.

157.    Each Producer Defendant participated in actions that reduced domestic egg supplies from 2022 to the present, with the effect of fixing, raising, maintaining, or stabilizing the price of shell eggs and egg products.

158.    Industry participants publicly attributed elevated prices to supply shortages caused by HPAI (avian flu). For example, the CEO of the American Egg Board stated that high prices were the direct result of "very, very tight supply and consistently high demand."[24]

159.    However, available data is inconsistent with the industry's explanation.

160.    The United States experienced a significant avian flu outbreak in 2015, during which 43 million hens were lost. The reduction in flock size since 2022 mirrors the decline seen in 2015, but prices have increased more than three times as much per hen lost compared to the earlier outbreak.

161.    Over the past three years, egg prices have risen at levels far exceeding the reductions in domestic supply.

162.    According to USDA data analyzed by Farm Action, the average U.S. egg-laying flock was only 3.82% smaller in 2022, 3.16% smaller in 2023, and 5.18% smaller in 2024 compared to the same months in 2021.

163.    For example, Cal-Maine lost approximately 3.7 million hens to avian flu in late 2023 and early 2024, but added 8 million hens by November 2024—resulting in a flock of 60.1 million hens, 15% larger than before 2022.

164.    As depicted below, the egg laying hen population has remained relatively steady throughout the last decade, however prices have only spiked during the Class Period.

---

[24] Jenny Ahn et al., *Cracking Big Egg: Why the Industry's Narrative Doesn't Add Up*, Hunterbrook (Mar. 6, 2025), https://hntrbrk.com/big-egg/

29



165.    Additionally, the chart below focuses on the last five years; it shows that egg prices have surged dramatically, far outpacing minor reductions in supply.



166.    The actual decline in domestic supply was even smaller than flock reductions indicated, due to decreased egg exports and an increase in the laying rate per hen.

167.    Adjusting for these factors, the effective reduction in supply in 2022 was approximately 3.5 million hens—about 1% of the national flock—according to a presentation by a USDA-sponsored researcher in 2023, as depicted below.



168.    Egg production per hen has improved significantly since 2022, indicating that the losses in hens have had a disproportionately smaller impact on the egg supply compared to previous years, as evidenced by the narrowing gap between the two trend lines.

169.    Nonetheless, national average wholesale egg prices rose 127% in 2022, 54.6% in 2023, and 127.7% in 2024, according to an analysis by Hunterbrook of USDA data.

170.    These figures indicate price increases of 33% for every 1% reduction in supply in 2022, 17% per 1% reduction in 2023, and 25% per 1% reduction in 2024.

171.    On average, these rates exceed by more than threefold the price response observed in 2015, when prices rose by 7.16% for each 1% reduction in hens. That earlier rate was consistent with the commonly assumed price elasticity of egg demand.

172.    The price increase in the United States also exceeded those in Europe, which lost 50 million hens to HPAI between 2022 and 2023. European egg prices rose approximately 30% during this period, compared to nearly 170% in the United States.

31

173.    Other industry participants stated that they "do not see the supply and demand numbers that justify the prices being charged."[25]

174.    CNBC reported that, during the 2015 outbreak, wholesale egg prices rose 6% to 8% for every 1% decline in hens. By contrast, from 2022 onward, prices increased approximately 15% for every 1% decline.

175.    These data indicate that claims of an unprecedented shortage are overstated.

176.    Meanwhile, egg producers' profits increased sharply. Cal-Maine, the largest U.S. producer, reported annual gross profits three to six times higher than before the outbreak, exceeding $1 billion for the first time.

177.    Historically, producers have responded to HPAI outbreaks by rapidly rebuilding and expanding their flocks, which tempered price increases and returned prices to pre-epidemic levels.

178.    As Cal-Maine stated in its 2007 Annual Report, periods of high profitability traditionally led producers to increase capacity, which in turn lowered prices.

179.    After the 2015 outbreak, producers raised 15.3 million more pullets in 2015 than in 2014, and added another 8 million in 2016. From July 2015 to February 2016, they added an average of 4.15 million adult hens per month, replacing nearly all lost hens within seven months.

180.    As a result, average wholesale prices in 2015 were only 40% higher than the prior year and returned to pre-outbreak levels by early 2016.

181.    During the present outbreak, however, producers have maintained a persistent deficit in egg-laying capacity. From 2022 to 2024, producers added between 5 million and 20 million fewer pullets annually than they did in 2021.

182.    USDA reports in late 2022 and early 2023 noted producers' "cautious approach to expanding production" despite record-high wholesale prices.[26]

---

[25] Jenny Ahn et al., *Cracking Big Egg: Why the Industry's Narrative Doesn't Add Up*, Hunterbrook (Mar. 6, 2025), https://hntrbrk.com/big-egg/.
[26] U.S. Dep't of Agriculture, "Livestock, Dairy, and Poultry Outlook: January 2023" at 26 (Jan. 19, 2023), available at https://esmis.nal.usda.gov/sites/default/release-files/g445cd121/gx41nx08z/hh63v522z/LDP-M-343.pdf.

**a)    Producer Defendants have elected to collectively limit capacity since 2022**

183.    Upon information and belief, dominant egg producers have consciously declined to replenish their flocks as quickly as they could have and have elected not to repopulate their flocks back to pre-avian flu levels.

184.    A 2024 analyst report stated: "We suspect that producers have continued making the needed supply cuts in order to balance the market."[27]

185.    Even when the Producer Defendants have repopulated, they have been careful to exercise prudence in increasing capacity.

186.    For example, Producer Defendants have utilized animal welfare cage space allowances to implement their long-term capacity restriction scheme, much like they did in the past, as detailed below. When Producer Defendants do repopulate their flocks, they have used the opportunity to transition from 67 square inch cages to 144 square inch cages, which causes a drop in total capacity. Producer Defendants agreed to claim in public that the purpose of the program was for "animal husbandry." Privately, however, Producer Defendants acknowledged and discussed the fact that the program was conceived and intended to be one way for the industry to jointly reduce chick hatch given the supply problems that often plagued egg producers. This is some of the exact same conduct that several of the Defendants were found guilty of in the past.

187.    Yet another way that Producer Defendants stifled capacity was by deciding not to utilize idle facilities. These facilities stood unused prior to 2022, when the egg market was not as profitable as it is today. Despite demand for eggs surging since 2022, many of those facilities still stand idle today.

188.    Further, egg producers are able to withhold eggs during periods of low prices and release them when prices rise, due to cold storage. This is another mechanism for managing capacity.

**b)    Although the industry was better prepared for avian flu than it was during the last avian flu epidemic, capacity has recovered more slowly**

189.    During the last avian flu epidemic (2014-2015), producers lost and replaced over 35 million hens, executing a full recovery from the impact of HPAI cullings on the national flock within

---

[27] Stephens, Industry Note (Jan. 25, 2024).

33

eight months. In contrast, during the current avian flu epidemic, the egg-laying flock has yet to return to its pre-epidemic size of around 330 million hens. In 2023 and 2024, flock size fluctuated between 310 and 320 million hens before falling into the 300–310 million range in 2024. This is because—unlike in 2015—the egg industry has failed to meaningfully expand the number of fertilized eggs placed in incubators and the number of chicks hatched, keeping the supply of new egg-laying hens more or less stagnant.

190.    Further, this time around there appears to be a remarkable unwillingness among large egg producers to invest in the internal reconstruction or expansion of their egg-laying flocks in response to persistently high prices.

191.    This is despite the fact that the industry was better prepared for avian flu than it was in 2015, as the USDA and producers learned from the prior outbreak. This experience should have allowed egg producers to bounce back more quickly.

192.    Moreover, the average age of the domestic laying flock has fallen from 2022 to the present. According to multiple sources, the current U.S. flock is much younger than normal, and therefore more highly producing.

193.    In short, evidence indicates that Producer Defendants colluded to not add capacity or make up for lost hens as part of their scheme to restrict output and fix and raise prices industrywide.

194.    Producer Defendants' reluctance to expand capacity despite being able to sell at record high prices is economically irrational for a Defendant acting in its independent self-interest. The imposition of supply restrictions when prices are at record levels only makes sense if Defendants are agreeing with one another to restrict supply in order to maintain prices at record highs.

C.    **Soaring Egg Prices Cannot Be Explained by Market Conditions**

195.    Industry participants have attributed the recent surge in prices for Conventional Eggs to external factors such as increased demand, increases in input costs, or outbreaks of HPAI. However, taken together, demand trends, input costs, and supply constraints attributed to HPAI outbreaks do not explain the sustained increase in benchmark prices for Conventional Eggs during the Class Period.

34

196.    Public sources and Plaintiffs' expert economist's analyses confirm that market conditions do not explain the elevated prices of Conventional Eggs observed since 2022.

197.    Likewise, as explained above, the impact of avian flu on the domestic supply of Conventional Eggs was limited relative to prior outbreaks and cannot account for the magnitude or duration of recent price increases.

198.    Rather, the price of Conventional Eggs rose far more sharply and for a longer duration than would be expected under competitive conditions given observed supply and cost trends.

199.    The divergence between market conditions and observed prices is consistent with coordinated conduct to restrict capacity and influence benchmark pricing rather than with independent, competitive decision-making by producers.

### 1.    Demand Conditions Do Not Explain Elevated Conventional Egg Prices

200.    The demand for Conventional Eggs is relatively inelastic. Consumers generally purchase similar quantities of eggs regardless of price because eggs are a staple food without close substitutes.

201.    Egg consumption in the United States has remained stable over time. There is no evidence of a structural increase in demand that would account for sustained increases in the benchmark price of Conventional Eggs.

202.    As shown in the graph created by Cal-Maine below, demand for eggs is *lower* today than it was in 2019, and that demand has moved largely in parallel with the trend in supply.



203. The same graph shows that supply conditions during the 2015 HPAI outbreak were more severe—layer-hen numbers dipped further than at any point between 2022 and 2024—but prices did not experience increases comparable to those observed during the Class Period.

204. Per capita production of eggs has remained above per capita consumption in every year from 2022 to the present.

205. A chart compiled by United Egg Producers, the leading industry trade association, shows a decline in per capita egg consumption since 2019.



206. The available data indicate that demand for Conventional Eggs has not increased and therefore cannot explain the observed elevation in benchmark prices.

### 2. Production Costs Do Not Explain Elevated Conventional Egg Prices

207. Egg producers have publicly stated that increases in the price of feed, energy, and other inputs have contributed to higher prices for Conventional Eggs. However, cost data do not support these claims.

208. The Egg Industry Center reported that the cost of egg production increased by approximately 15% from 2021 to 2022. Cal-Maine's 2022 financial statements similarly reported that farm production and feed costs rose by 22% compared to 2021.

36

209.    During the same period, the wholesale price for a dozen large Grade A Conventional Eggs increased from $1.788 in December 2021 to $4.250 in December 2022—an increase of 138%.

210.    Chicken feed is the most significant input cost in the production of Conventional Eggs. Cal-Maine's Form 10-K for fiscal 2024 reported that feed represented 56.0% of its farm production costs, while other sources have reported that it represents as much as 60-70%.

211.    Yet, the relative stability of feed prices compared to the increase in Conventional Egg prices suggests that Conventional Egg price increases during the Class Period were more likely the product of Defendants' collusion than any increase in feed costs.

212.    Plaintiffs' expert economist analyzed this relationship using publicly available, authoritative data sources, including time-series data from the Federal Reserve Economic Data ("FRED") database maintained by the Federal Reserve Bank of St. Louis, as well as Bureau of Labor Statistics price indices. These sources are widely relied upon by economists, regulators, and courts for empirical economic analysis. Using these data, the expert evaluated the relationship between feed costs and Conventional Egg prices over time and found that movements in feed costs do not explain the observed pricing behavior during the Class Period. The analysis demonstrates that Conventional Egg prices increased independently of, and far in excess of, any justification based on chicken feed cost.



### Egg Price Spikes Are Not Attributable to Increasing Chicken Feed Costs

213.    The disconnect between chicken feed input costs and market prices is economically significant. Because chicken feed represents a critical marginal cost of production, the failure of egg prices to track feed costs indicates that prices were not being set through competitive forces. Instead, the sustained elevation of prices in the absence of similarly elevated costs is consistent with coordinated conduct to fix, raise, and maintain prices above competitive levels.

214.    While Defendants have also pretextually justified their Conventional Egg prices by citing energy costs—a substantially less significant input cost than feed—energy costs appear entirely detached to Conventional Egg prices and have actually decreased during the Class Period. As the below graph demonstrates, natural gas and liquid propane experience substantial price drops throughout 2022 and 2023 at the same time that shell egg prices spiked:



215.    A senior executive at a large egg producer that did not adopt the significant price increases at issue stated: "I don't see anything in my cost structure that would have led me to raise our prices by as much as you're reporting."[28]

216.    Increases in production costs, whether in feed, energy, or other inputs, cannot account for the magnitude or persistence of the elevated benchmark price for Conventional Eggs.

217.    Nor did the unprecedented increases in benchmark prices translate into increased compensation for contract growers or farmers. Public reporting and industry disclosures show that grower pay remained flat or changed only modestly during the Class Period, even as benchmark prices and producer profits surged to historic highs. This disconnect between skyrocketing wholesale prices and stagnant grower compensation further undermines producers' claims that higher prices were driven by increased farm-level costs.

### 3.    There Have Been No Material Constraints on Rebuilding Additional Capacity

218.    The industry has also suggested that limited availability of chicks or other inputs prevented producers from restoring capacity quickly. Available evidence does not support this assertion.

219.    Producers with internal breeding operations can generally repopulate egg production facilities within a matter of months after an HPAI-related depopulation.

220.    Producers that rely on external suppliers of pullets likewise faced no material constraints. There is no indication that producers had difficulty sourcing day-old chicks necessary for flock rebuilding.

221.    The industry's ability to rebuild rapidly after the 2014–2015 outbreak demonstrates the absence of structural barriers to restoring supply. During that period, producers replaced more than 35 million hens and fully recovered within eight months.

222.    The slower recovery following the 2022–2024 HPAI outbreaks is therefore inconsistent with prior industry behavior and cannot be explained by physical or logistical constraints.

---

[28] Brooke DiPalma, *Vital Farms Raised Egg Prices "Reluctantly and in Small Amounts": CEO*, Yahoo! Finance (Jan. 28, 2023), https://finance.yahoo.com/news/vital-farms-raised-egg-prices-reluctantly-and-in-small-amounts-ceo-132140110.html.

223.   These facts indicate that producers could have restored the supply of Conventional Eggs more quickly than they did and that the pace of rebuilding reflects deliberate decisions not to expand capacity.

### 4.   HPAI Outbreaks Do Not Explain Inflated Conventional Egg Prices

224.   Although the defendant egg producers have attributed soaring egg prices to HPAI outbreaks, publicly available data suggests that avian flu does not credibly account for the scale of the price increases consumers experienced since 2022.

225.   As explained above in Section V.B.2, USDA figures show that the U.S. layer flock shrank by only a few percentage points annually relative to 2021, with the effective net reduction in 2022 amounting to roughly 1%, yet shell egg prices surged by 127% that same year. By contrast, the 2014–2015 avian flu outbreak killed a comparable number of hens, and shell egg price increases were three to four times smaller. Moreover, the roughly 144 million hens lost since 2022 were culled gradually over more than three years, substantially blunting the cumulative supply impact.

226.   The disconnect between HPAI outbreaks and Conventional Egg prices is further demonstrated by comparison to Europe, which lost even more layer hens than the United States in 2022, and still saw egg prices rise only about 30%.

227.   Further, HPAI outbreaks during the Class Period were geographically concentrated in specific states and regions, yet benchmark prices increased uniformly nationwide. For example, within the U.S., the Southeast—which had no confirmed HPAI cases in commercial egg facilities through late 2024 and actually increased production during that time—nonetheless experienced price spikes rivaling those in outbreak-affected regions.

228.   Historical data show that regionalized outbreaks do not produce national price spikes of this magnitude under competitive conditions. The disconnect between localized flock losses and nationwide price surges further indicates that benchmark pricing reflected coordinated behavior rather than actual disease impacts.

**5.      Economic Analysis Shows that the Spike in Egg Prices is Attributable to Defendants' Conduct, and not Rising Feed Prices or Avian Flu Infections**

229.    Plaintiffs' preliminary economic analysis, based on available data, debunks the Producer Defendants' claims that egg price hikes are attributable to market conditions, including avian flu.

230.    Plaintiffs' expert economist conducted a formal econometric analysis to evaluate whether observed increases in Conventional Egg prices can be explained by fundamental market factors, including input costs and supply disruptions. Using publicly available, reliable datasets—including Bureau of Labor Statistics PPI data, USDA data on HPAI infections among commercial egg-laying flocks, and FRED time series data—the expert analyzed the relationship between chicken feed costs, HPAI-related supply shocks, and shell egg prices over time. The resulting regression analysis demonstrates that neither fluctuations in feed costs nor HPAI-related supply disruptions fully account for the magnitude or timing of the dramatic increases in Conventional Egg prices observed during the Class Period. Instead, the analysis reveals a substantial and persistent portion of egg price increases that cannot be explained by these fundamental economic drivers. In economic terms, this unexplained residual reflects price movements that are untethered from competitive market conditions. Plaintiffs' economist concludes that Plaintiffs and members of the Class paid prices significantly above competitive levels—*i.e.*, supracompetitive prices—during the alleged conspiracy period.



231.    To ensure the robustness of these findings, the expert employed a multiple regression framework incorporating control variables for (1) chicken feed costs, (2) HPAI-related supply impacts, (3) demand conditions, and (4) seasonal pricing patterns historically observed in agricultural commodity markets. The model also included indicator (dummy) variables to isolate the period of the alleged conspiracy and measure its independent effect on prices. After accounting for these factors, the analysis finds that egg prices during the Class Period were significantly higher than predicted by the model, with the unexplained increase both economically large and statistically significant.

232.    The results of this analysis are consistent with coordinated conduct and reveal a systematic shift in pricing behavior during the Class Period. In the pre-conspiracy period, actual egg prices were distributed symmetrically around the model's predicted competitive benchmark—approximately half of observed prices fell above the predicted level and half fell below it, as would be expected in a competitive market with normal variation.

233.    During the Class Period, however, this distribution shifted markedly. Approximately 76% of observed prices exceeded the model's predicted values, indicating that actual prices were persistently and disproportionately higher than would be expected based on fundamental market factors. This pronounced skew—where actual prices consistently exceed predicted competitive levels—demonstrates that prices were not fluctuating randomly around equilibrium, but instead were systematically elevated above it.

42



**Predicted Supply-and-Demand Price vs. Actual Price**

234.    Such a sustained and asymmetric divergence from predicted prices is inconsistent with competitive market dynamics and is indicative of supracompetitive pricing. The accompanying charts illustrate this shift, showing that while the model accurately tracks price variation in the pre-conspiracy period, it consistently underpredicts prices during the Class Period—reflecting the presence of an external force, namely Defendants' coordinated conduct, driving prices above competitive levels.

**D.      The Structure and Characteristics of the Conventional Egg Market Make the Conspiracy Economically Plausible**

**1.      The Market for Conventional Eggs Is Vertically Integrated**

235.    The industry producing Conventional Eggs is highly vertically integrated. Producers control nearly all stages of production, including chick hatching, pullet rearing, feeding, housing, flock management, egg processing, packaging, and marketing.

236.    Producers that hatch their own chicks, such as Cal-Maine, can adjust output more precisely to capacity and demand conditions. Vertical integration places effective control of supply, and thus potential output, entirely in producers' hands.

43

237.    Large, vertically integrated producers also maintain control over activities that require specialized resources, such as biosecurity cleaning following avian flu outbreaks, which further enhances their ability to regulate production levels and timing.

### 2.    Demand for Conventional Eggs Is Inelastic and Has Not Increased

238.    As described above, the demand for Conventional Eggs is relatively inelastic. Consumers purchase similar quantities of eggs regardless of price because eggs are a staple food.

239.    Eggs have no close substitutes for consumers or industrial users. According to the American Egg Board, eggs possess unique nutritional and functional attributes that are not replicated by a single alternative ingredient.

240.    Eggs provide more than twenty functional benefits in food preparation—including adhesion, emulsification, browning, leavening, and flavor—making substitution difficult for manufacturers and foodservice operators.

241.    Consumers also have limited ability to substitute toward other proteins given the historically large price gap between eggs and alternative sources such as meat.

242.    As a result, the inelasticity of demand limits competitive pressures and increases the incentive and feasibility of coordinated conduct.

### 3.    The Market for Conventional Eggs Has Experienced Significant Consolidation

243.    The industry has consolidated significantly in recent years. In a span of 24 months, the top five producers' share of the U.S. layer-hen flock increased from 37% to 46%.

244.    In addition to formal consolidation, producers engage in de facto consolidation through arrangements such as co-packing, contract production, and marketing agreements that give them practical control over smaller firms' output.

245.    Producers also market eggs jointly under brands such as Eggland's Best. These arrangements can involve the sharing of confidential business information related to production and pricing.

#### 4.  Defendants Had Numerous Opportunities for Communication and Exchange of Information

246.  Trade associations such as United Egg Producers ("UEP") and United States Egg Marketers ("USEM") hold regular meetings, conferences, and committees where producers can interact in person.

247.  Urner Barry hosts an annual Executive Conference that includes roundtables with market reporters and discussions on "market developments impacting pricing."[29] Urner Barry markets these events as opportunities to form close industry relationships.

248.  Defendants also engage in business dealings with one another, including selling feed, sharing logistics services, and participating in joint ventures. These arrangements can result in the exchange of operational information among producers.

249.  Defendants also rely on a small group of financial institutions for debt financing and acquisition-related services. These institutions gain access to detailed confidential information about producers' operations, providing another channel through which information can circulate.

#### 5.  High Barriers to Entry Facilitate Coordination

250.  Entry into the production of Conventional Eggs requires substantial capital investment, including the construction of laying barns, pullet houses, processing facilities, feed mills, and distribution infrastructure. Additional barriers include securing regulatory approvals, specialized equipment, and experienced management and labor.

251.  These barriers have limited entry. Each of the major producers has been in the business for at least three decades, and Versova is a holding company for long-standing producers.

252.  High barriers to entry reduce the likelihood that new competitors will undermine supracompetitive prices, making coordinated conduct more stable.

---

[29] Urner Barry, "UB Executive Conference Tentative Schedule: May 1-3, 2022, Bellagio, Las Vegas," available at https://www.urnerbarry.com/PDF/events/exec/Exec2022_Tentative_Schedule_20220407.pdf (last visited Apr. 15, 2026).

### 6.  Producers Have Similar Cost Structures

253.    Producers of Conventional Eggs have similar cost structures due to the standardized nature of industrial egg production. Producers use similar aviary equipment, pullet systems, layer houses, and processing technology.

254.    The limited number of suppliers of hatchery, aviary, and processing equipment further contributes to similarities in production methods and costs across producers.

255.    Similar cost structures make coordinated pricing strategies more feasible because producers face comparable economic constraints and incentives.

### E.  Defendants' Collusion Has Led to Unprecedented Profits

256.    During the Class Period, dominant producers of Conventional Eggs achieved profit margins substantially higher than historical norms and sustained these margins over multiple years.

257.    Although early industry forecasts suggested that producers would face financial losses due to avian flu, producers instead reported exceptional profitability.

258.    Cal-Maine's net income rose from $133 million in 2022 to $758 million in 2023, nearly tripling the highest annual net income previously reported in its history. Cal-Maine reported that revenue for the quarter ending in November 2023 increased to $954 million from $523 million the prior year, citing higher average selling prices and increased volume.

259.    Cal-Maine's stock price reached repeated record highs during the Class Period.



46

260.    Although other Defendants are not public companies, and therefore do not report their earnings in the same manner as Cal-Maine, on information and belief, similarly unprecedented profit growth occurred at the other dominant egg producers.

261.    For example, in 2024, Rose Acre and Versova were operating at an almost 15% profit margin, which is unusually high in a commodity agricultural market.

**F.      Members of Congress, Federal Enforcement Agencies, and Consumer Groups Have Raised Concerns That Soaring Prices of Conventional Eggs Are the Product of Collusion**

262.    Growing economic evidence of price inflation in the conventional egg market— untethered from supply, demand, or cost conditions—has attracted significant attention from lawmakers, federal agencies, and public-interest organizations, who have identified the same concerns Plaintiffs allege here: (1) potential manipulation of the industry's benchmark pricing system, and (2) coordinated supply restriction among dominant producers.

263.    On January 19, 2023, Farm Action submitted a detailed letter to the Federal Trade Commission ("FTC") warning of "apparent price gouging, price coordination, and other unfair or deceptive acts or practices by dominant producers of eggs such as Cal-Maine, Rose Acre, Versova, and Hillandale, among others."[30] Farm Action emphasized that conventional egg prices had risen far faster than could be justified by the avian flu outbreak or production costs, and that the structure of the egg market—including its reliance on Urner Barry benchmark pricing—made it particularly susceptible to manipulation.

264.    On January 24, 2023, U.S. Senator Jack Reed formally urged the FTC to open an investigation into "potential price gouging and other deceptive practices by the country's largest egg companies," highlighting that dominant producers feed confidential pricing information directly into the Urner Barry conventional egg index and therefore may influence an industry-wide benchmark on which billions of dollars in formula-priced contracts depend.[31]

---

[30] Jan. 19, 2023 Ltr. from Basel Musharbash, Farm Action to Fed. Trade Comm'n Chair Lina Khan, available at https://farmaction.us/wp-content/uploads/2023/01/Farm-Action-Letter-to-FTC-Chair-Lina-Khan.pdf.
[31] Jan. 24, 2023 Ltr. from Sen. Jack Reed to Fed. Trade Comm'n Chair Lina Khan, available at https://www.reed.senate.gov/imo/media/doc/reed_letter_to_ftc_on_egg_prices_12423.pdf.

265.    On January 26, 2025, a group of Senators and Members of Congress wrote to President Trump to express alarm at skyrocketing conventional egg prices and warned that "[e]gg producers . . . may leverage the current avian flu outbreak as an opportunity to further constrain supply or hike up egg prices to increase profits."[32] The letter specifically cited Cal-Maine's "significant jump in gross profits" as inconsistent with the industry's claimed supply shocks.[33]

266.    On February 5, 2025, FTC Commissioner Alvaro Bedoya, in one of his final official acts, wrote to Chairman Ferguson stating that "egg prices are exorbitant" and urging the FTC to investigate "egg production and marketing practices," with particular emphasis on whether dominant producers used the avian flu as a pretext to limit production or influence benchmark pricing.[34]

267.    On February 12, 2025, Farm Action submitted a second letter, addressed jointly to the FTC and the Department of Justice ("DOJ"), calling for an antitrust investigation into "concentration, price-setting systems, and production and marketing practices in the egg production industry and its surrounding supply chains."[35] The letter highlighted the key features also alleged here: extreme concentration, the susceptibility of Urner Barry's conventional egg index to manipulation by major producers, and the "slow recovery in flock size, despite historically high prices," which "further suggests coordinated efforts to restrict supply and sustain inflated prices."[36]

268.    On March 7, 2025, *The Wall Street Journal* reported that the DOJ Antitrust Division had opened a formal investigation into whether the nation's largest egg producers engaged in anticompetitive conduct. According to the article, DOJ investigators are examining whether "major egg companies coordinated supply limitations or influenced the industry benchmark price in ways that drove up costs for consumers and downstream purchasers."[37]

---

[32] Jan. 26, 2025 Ltr. from Sen. Elizabeth Warren, et al. to President Donald J. Trump, available at https://www.warren.senate.gov/imo/media/doc/letter_to_trump_re_egg_prices.pdf.
[33] *Id.*
[34] Feb. 5, 2025 Ltr. from Fed. Trade Comm'n Comm'r Alvaro M. Bedoya to Fed. Trade Comm'n Chairman Andrew Ferguson, available at https://x.com/BedoyaFTC/status/1887222389408215548/photo/1.
[35] Feb. 12, 2025 Ltr. from Angela Huffman, Farm Action to Fed. Trade Comm'n Chairman Andrew Ferguson & Acting Assistant Attorney General Omeed Assefi, https://farmaction.us/wp-content/uploads/2025/02/Final_FarmAction_FTC_DOJ_EggPricesLetter.pdf.
[36] *Id.*
[37] Dave Michaels & Patrick Thomas, *Justice Department Opens Probe of Sharp Surge in Egg Prices*, Wall Street J (Mar. 7, 2025), https://www.wsj.com/business/egg-prices-justice-department-probe-22d6a4f6.

269.    These public warnings from Members of Congress, the FTC, the DOJ, and respected nonprofit organizations are consistent with, and lend further plausibility to, Plaintiffs' allegations that Defendants conspired to fix, raise, maintain, and stabilize the prices of conventional eggs through coordinated manipulation of the benchmark pricing system and a sustained, industry-wide restriction of production capacity.

**G.    The Sharp, Parallel Drop in Prices Following Public Disclosure of the DOJ Investigation Further Indicates Collusion**

270.    In early March 2025, news outlets reported that the DOJ Antitrust Division had opened an investigation into whether major egg producers engaged in anticompetitive conduct in the market for Conventional Eggs.

271.    In the two weeks following public reporting of the DOJ investigation, the benchmark price for Conventional Eggs dropped abruptly and in parallel across the industry, despite no corresponding changes in supply, demand, or input costs.

272.    Plaintiffs' economic analysis confirms that this precipitous drop cannot be explained by ordinary market forces. To quantify the effect of the DOJ investigation, Plaintiffs' expert economist conducted an event study—a widely accepted econometric method used to isolate the impact of a discrete event on prices by comparing observed price movements to those predicted based on historical trends and volatility. Using publicly available data, the expert first established a baseline of normal price behavior by analyzing daily and weekly egg price movements during a pre-event period (January 1, 2024 through December 31, 2024). This baseline was used to estimate expected price changes and volatility under typical market conditions. The expert then compared these expected price movements to the actual price changes observed following the DOJ announcement.

273.    The expert's preliminary analysis predicts that based on historical price volatility, March 2025 market conditions would have only led to a 19% drop in Conventional Egg prices between March 3 and March 17, 2025—not the 69% drop that occurred, which was *3.6 times greater than normal predicted price volatility.* This deviation is not only economically large but statistically extraordinary, far exceeding the range of normal price fluctuations observed in the historical data.

## Urner Barry Egg Prices in Response to DOJ Investigation



**-19%** Expected Egg Price Decline

**-69%** Actual Egg Price Decline in the Two Weeks Following the DOJ Investigation

The price volatility **(19%)** is the standard deviation of bi-weekly percentage price changes in the Urner Barry egg index using prices from January 1, to December 30, 2024.

The **69%** decline following the DOJ Antitrust Investigation was **3.6 times greater** than normal price volatility.

This indicates a *statistically significant* price reversal between March 3 and March 17th, 2025.

274.    The sharp drop in Conventional Egg prices following the DOJ's March 2025 investigation announcement drew scrutiny from members of Congress. In a May 8, 2025 letter in support of the DOJ's investigation, Senators Elizabeth Warren and Jim Banks expressed "concern[] that record high egg prices reflect noncompetitive behavior among large producers."[38]

275.    The sudden and industry-wide collapse in prices following the announcement of antitrust scrutiny is inconsistent with independent, competitive behavior by producers of Conventional Eggs.

276.    Rather, the speed and magnitude of the price decline strongly suggest that the supracompetitive prices prevailing before the DOJ announcement were the product of coordinated conduct that dissipated when producers perceived a heightened risk of detection.

277.    Such a market response is a well-recognized plus factor that supports the plausibility of a price-fixing conspiracy: when prices fall rapidly and uniformly after the initiation of government scrutiny, it indicates that prior price levels were not the result of legitimate market conditions.

---

[38] May 8, 2025 Ltr. from Sens. Elizabeth Warren & Jim Banks to Assistant Attorney General Gail Slater, available at https://www.warren.senate.gov/imo/media/doc/warren_banks_letter_to_doj_on_egg_prices.pdf.

**H.**    **Several Defendant Egg Producers are Antitrust Recidivists Found Liable for Similar Anticompetitive Conduct in the Past**

278.    These are not the first antitrust and price gouging allegations against Defendants.

279.    In 2008, direct purchasers of eggs sued various trade groups and egg producers, including Defendants Cal-Maine, Daybreak, Hillandale, and Rose Acre.[39] They asserted that these producers had conspired to limit the supply of eggs in order to raise prices.

280.    Specifically, the 2008 plaintiffs alleged that producers implemented and enforced supply restrictions by, *inter alia*, developing and implementing an egg certification program, exporting eggs at a loss, and reducing egg production through coordinated actions like reducing hatch, early molting, and hen disposal.

281.    All producer-defendants but one settled, leading to a total recovery for direct purchaser plaintiffs of over $136 million.

282.    In 2011, Kraft Foods Global, Inc. and The Kellogg Company sued several egg producers, including Defendants Cal-Maine and Rose Acre, alleging that they conspired to reduce the supply and increase the price of egg products.[40] Among other allegations, Kraft and Kellogg blamed the anticompetitive conduct on the unusually cozy nature of the egg industry.

283.    After a seven-week trial, a jury concluded that the defendants had indeed engaged in a conspiracy, creating an antitrust injury from October 2004 to December 2008. The "the most important part" of the adjudicated conspiracy in *Kraft* was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs.[41] UEP Certified is still in force today.

284.    The jury awarded $17.8 million in damages; trebled, this amount was more than $53 million.

285.    In 2020, the New York Attorney General filed a complaint against Hillandale relating to egg price gouging during the COVID-19 pandemic. The Attorney General alleged that the illegal

---

[39] *In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719, 725 (3d Cir. 2020).
[40] *Kraft Foods Global, Inc. v. UEP.*, 2024 WL 4346418, at *1 (N.D. Ill. Sept. 30, 2024).
[41] *Id.* at *5.

feedback loop worked like this: (1) Hillandale and other egg producers told Urner Barry their assessment of egg prices; (2) Urner Barry used these assessments to create "indexed" prices that it sent to egg producers; and (3) the producers sold eggs at the price set by Urner Barry, citing the index as their method for setting a "fair" price.

286.    Hillandale reached a settlement with the New York Attorney General in which it donated 1.2 million eggs to food pantries. Hillandale also agreed to "refrain from any further excessive pricing of eggs."[42]

287.    The Texas Attorney General similarly accused Cal-Maine of price-gouging during the COVID-19 pandemic. That case remains ongoing.

## I.    Multiple Plus Factors Reinforce the Plausibility of the Alleged Conspiracy

288.    Several well-recognized "plus factors" support the plausibility of the alleged conspiracy among Defendants to fix, raise, maintain, and stabilize the price of Conventional Eggs. These plus factors reinforce the inference that Defendants' parallel conduct was the product of agreement, not independent decision-making.

### 1.    Parallel Conduct in Pricing and Capacity Reduction

289.    As described above, Producer Defendants acted in parallel by restricting flock expansion, slowing repopulation, reducing pullet placements, maintaining idle facilities, withholding eggs through cold storage, and increasing cage-space allocations in ways that uniformly reduced their production capacity for Conventional Eggs.

290.    Defendants' prices for Conventional Eggs moved in close alignment across the industry, both during the period of supracompetitive prices and immediately following public disclosure of the DOJ investigation, when prices fell sharply and in parallel.

291.    The price collapse immediately following DOJ disclosure is powerful circumstantial evidence of prior coordinated behavior.

---

[42] Press Release: "Attorney General James Delivers 1.2 Million Eggs to New Yorkers" (Apr. 1, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-delivers-12-million-eggs-new-yorkers.

**2.      A Market Structure and Benchmark System That Facilitates Coordination**

292.    The market for Conventional Eggs is highly concentrated, vertically integrated, and characterized by high barriers to entry, similar firm cost structures, and limited substitutes—structural features that make collusion easier to initiate and sustain.

293.    The industry's reliance on a single benchmark pricing system—the Urner Barry Midwest Large quotation—further increases susceptibility to collusion. Because many transactions are tied to the benchmark, influencing this benchmark allows producers to raise prices industry-wide with limited coordination.

294.    ECI's structure as a thin, opaque, blind-bid spot market that feeds directly into the benchmark further contributes to the ability of dominant producers to influence benchmark pricing.

**3.      Opportunities to Collude**

295.    Defendants had numerous opportunities to communicate through trade associations such as UEP and USEM, through Urner Barry's annual Executive Conference and industry roundtables, through co-packing and Eggland's Best joint marketing arrangements, and through repeated business dealings with the same cluster of financing institutions that obtained access to confidential operational information.

296.    These interactions created both the means and the opportunities for producers to exchange sensitive information relating to pricing, production, supply levels, and capacity strategies.

**4.      A History of Similar Anticompetitive Conduct**

297.    Several Defendants have been implicated in prior antitrust investigations or litigation involving coordinated reductions in egg supply, including agreements to reduce cage density and coordinated flock-reduction practices that raised prices.

298.    Such a history of analogous conduct supports an inference that Defendants had both the motive and the willingness to engage in a similar conspiracy during the Class Period.

299.    The recidivist nature of several Defendants—each previously accused or found liable for coordinating supply reductions and influencing benchmark pricing—further strengthens the inference of collusion. Courts recognize that a history of similar antitrust violations is a powerful plus factor because

53

it demonstrates both a willingness and a proven capacity to engage in coordinated output restriction and benchmark manipulation

### 5.      Government Scrutiny and Public Concern

300.    As set forth above, Members of Congress, FTC officials, advocacy organizations, and the DOJ Antitrust Division itself have raised concerns that the recent spike in conventional egg prices reflects collusion among dominant producers.

301.    Public reporting that the DOJ had opened an investigation was followed by a sharp and immediate decline in the benchmark price of Conventional Eggs, further supporting an inference that elevated prices were maintained through coordinated conduct.

### 6.      Sustained Supracompetitive Profits Inconsistent with Competition

302.    Dominant producers realized historically unprecedented profit margins during the Class Period, far exceeding what could be explained by changes in costs, demand, or supply fundamentals. These sustained supracompetitive margins are consistent with coordinated conduct and inconsistent with competitive market dynamics.

### 7.      Producer Defendants Acted Contrary to Their Independent Economic Self-Interest

303.    Defendants also acted contrary to their independent economic self-interest, which is a well-recognized plus factor supporting the existence of a horizontal agreement. During a period of record-high benchmark prices for Conventional Eggs, when any rational, profit-maximizing firm would have been expected to expand output to capture extraordinary margins, Producer Defendants instead uniformly reduced or restrained capacity: they slowed pullet placements, failed to rebuild flocks to pre-HPAI levels, maintained idle housing and processing facilities, withheld eggs through cold storage, and used cage-space conversions in ways that decreased total production.

304.    This behavior sharply diverged from Producer Defendants' own historical conduct—most notably their rapid and aggressive flock rebuilding following the 2015 HPAI outbreak—and cannot be explained by any genuine supply constraints. The industry faced no meaningful shortage of chicks or hatching eggs; producers were better prepared for HPAI than in prior years; improvements in genetics

54

increased egg-per-hen productivity; and input costs such as feed and energy were stable or declining. Yet Producer Defendants deliberately chose *not* to expand capacity despite unprecedented profitability.

305.    Such uniform restraint in the face of extraordinary economic incentives to deviate is irrational absent coordination, and strongly supports the inference that Producer Defendants agreed to restrict supply and maintain supracompetitive prices for Conventional Eggs.

### 8.    Absence of a Regulated Futures Market Facilitated Collusion

306.    The market for Conventional Eggs lacks a regulated futures market, unlike nearly all other major agricultural commodities (including wheat, soybeans, corn, hogs, and cattle) that trade on CFTC-regulated exchanges. The absence of a futures market means there is no independent, high-volume mechanism for transparent price discovery, no participation by financial intermediaries, and no regulatory oversight by the Commodity Futures Trading Commission.

307.    This structural gap magnifies Defendants' ability to influence ECI spot prices and Urner Barry benchmark assessments, because the thin, opaque ECI spot market becomes the only objective numerical input into the benchmark. Without futures-market participation or CFTC supervision, benchmark prices are uniquely susceptible to manipulation by the largest producers—further supporting the plausibility of the alleged conspiracy.

*    *    *

308.    Taken together—parallel conduct, capacity restriction, manipulation of benchmark pricing, opportunities to conspire, market structure conducive to collusion, information exchange, unprecedented parallel profits, a sudden collapse in prices following DOJ scrutiny, and a lack of a futures market—these factors strongly support the inference of a conscious commitment to a common scheme, rather than independent parallel conduct.

## VI.    THE RELEVANT MARKET

309.    This case challenges a horizontal conspiracy among the nation's largest producers of Conventional Eggs—facilitated in part through shared benchmark-setting mechanisms such as Urner Barry and ECI—to fix, raise, maintain, and stabilize prices nationwide. Such conduct constitutes a per se

55

unlawful price-fixing agreement under Section 1 of the Sherman Act and therefore does not require proof of market power.

310. The conduct also constitutes an unlawful information-exchange, in which Producer Defendants—direct horizontal competitors—collectively provided competitively sensitive, non-public production and pricing information to Urner Barry and coordinated their bidding and selling behavior on ECI, thereby suppressing price competition and enabling industry-wide price elevation.

## A.    The Relevant Product Market

311. To the extent a market definition is required, the relevant product market is the market for Conventional Eggs sold in the United States. "Conventional Eggs" refers to ordinary table eggs produced from caged, cage-free, or aviary hens so long as they are not marketed as specialty eggs (e.g., organic, pasture-raised, free-range, Omega-3 enhanced, or other premium specialty categories). This market excludes processed egg products (liquid, frozen, dried) except where contract pricing directly incorporates Conventional Egg benchmarks.

312. Conventional Eggs constitute a distinct economic product because they are the form of eggs purchased by the overwhelming majority of U.S. households. They follow a uniform grading and sizing system (e.g., "Large Grade A"), are priced using shared benchmarks (primarily the Urner Barry Midwest Large quotation), are widely interchangeable across producers, and are purchased through similar distribution channels including grocers, wholesalers, distributors, club stores, and foodservice providers.

313. Specialty eggs—such as organic, pasture-raised, or free-range eggs—are **not** reasonably interchangeable with Conventional Eggs. They involve distinct production methods, regulatory requirements, cost structures, branding strategies, consumer demand profiles, and pricing dynamics. Specialty eggs also do *not* rely on the Urner Barry Conventional Egg benchmark, and their prices did not increase during the Class Period to anywhere near the extent that Conventional Egg prices did.

314. Conventional Eggs provide unique functional, nutritional, and culinary attributes that cannot be replaced at scale by other products. There is no practical or economic substitute—whether plant-based alternatives, processed egg products, or other proteins—that meaningfully constrains the

pricing of Conventional Eggs. Demand for eggs is well-documented as highly inelastic, further distinguishing this market.

315.    The Supreme Court's "practical indicia" factors identified in *Brown Shoe v. United States*, 370 U.S. 294 (1962), confirm that Conventional Eggs form a distinct product market. The industry recognizes Conventional Eggs as their own market segment; they have unique production facilities (layer barns, pullet houses, feed mills); a distinct customer base; uniform pricing mechanisms tied to a single benchmark; and sensitivity to different supply shocks than specialty eggs or egg products.

316.    Benchmark pricing itself reflects this product-market distinction. Urner Barry publishes a separate quotation for Conventional Large Shell Eggs, which Producer Defendants rely upon for formula pricing. The quotation does *not* incorporate specialty eggs, confirming that the industry itself recognizes Conventional Eggs as a separate market.

### B.    Economic and Practical Indicia

317.    The market for Conventional Eggs easily satisfies the DOJ/FTC SSNIP test: producers have repeatedly raised the benchmark price by multiples of 5–10% (and at times far more)—including increases exceeding 100%—without losing significant sales volume, demonstrating that purchasers cannot and do not switch to substitutes in response to higher prices.

318.    Industry participants, analysts, regulators, and trade publications universally treat Conventional Eggs as a distinct product category. Urner Barry, ECI, the American Egg Board, USDA's AMS reporting, and egg-market economists analyze pricing and supply for Conventional Eggs separately from specialty eggs.

319.    Pricing behavior further confirms market definition. Nearly all large producers—including each Producer Defendant—sell Conventional Eggs at prices tied directly or indirectly to the Urner Barry benchmark, which is unique to Conventional Eggs and exerts no control over specialty-egg pricing.

320.    The production process also supports market separation. Conventional Eggs are produced using uniform inputs, barn configurations, flock-management strategies, and feed formulations that

differ materially from the processes used in pasture-raised, organic, or other specialty-egg systems. Switching between these systems requires substantial new capital investment, regulatory compliance, and changes in bird-housing architecture.

321. Cost structures, consumer expectations, and marketing channels differ sharply between Conventional Eggs and specialty eggs. Specialty eggs consistently command substantially higher prices and have distinct demand drivers related to animal welfare, sustainability, and brand identity.

322. Accordingly, the relevant product market for both the price-fixing and information-exchange claims is the market for Conventional Shell Eggs in the United States, in which Producer Defendants directly compete and coordinate price and supply decisions.

## C.      The Relevant Geographic Market

323. The relevant geographic market is the **United States**. Producer Defendants sell Conventional Eggs nationwide, participate in nationwide benchmark pricing via Urner Barry, and compete on a national basis with respect to supply, pricing, contract terms, and distribution.

324. Urner Barry's benchmark is national in scope: it collects producer data, ECI pricing, and confidential client submissions from across the United States and issues a single daily quotation for Conventional Eggs that governs pricing throughout the country.

325. ECI, too, functions as a nationwide pricing mechanism. Its blind-bid spot market aggregates participants from across the country and is treated by the industry as a national price-discovery platform. The prices established on ECI feed directly into Urner Barry's national benchmark.

326. Defendants themselves have nationwide production, distribution, and customer networks. They ship eggs across state lines, respond to national supply and demand conditions, adjust production in response to national disease-outbreak patterns, and use national pricing mechanisms rather than region-specific price setting.

327. The fungibility of Conventional Eggs likewise supports a national market: eggs produced in any region of the United States can be shipped to customers in any other region with minimal cost or delay.

328.    Accordingly, the relevant geographic market for Defendants' price-fixing and information-exchange conspiracy is the United States.

## VII.    DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

329.    To the extent proof of market power is required under a rule-of-reason analysis, Producer Defendants collectively possess market power in the U.S. market for Conventional Eggs. As alleged above, the top producers—including Producer Defendants—control a dominant and growing share of the nation's layer-hen flock, enabling sustained supracompetitive pricing.

330.    **Direct evidence** of market power exists in Producer Defendants' ability to raise and maintain benchmark prices for Conventional Eggs to historically unprecedented levels—often doubling or tripling without any competitive response—and to sustain those prices over multiple years, despite flat demand and declining costs.

331.    **Indirect evidence** reinforces this conclusion. The market is highly concentrated, vertically integrated, and characterized by high barriers to entry, similar cost structures, a shared benchmark system, limited substitutes, and inelastic demand. These features confer on Producer Defendants the collective ability to profitably raise prices and restrain output.

332.    Producer Defendants' dominance is reflected in their control of the layer-hen population. The top producers collectively control a substantial percentage of the national flock; several of them exceed 10% market share individually; and the top five producers' combined share has grown sharply in recent years, now comprising nearly half of all U.S. layer hens.

333.    Absent collusion, these firms could not have simultaneously and persistently raised and maintained prices at supracompetitive levels without losing significant business to rivals. Their ability to do so confirms that they collectively possess market power and that their agreement to restrict supply and manipulate benchmark pricing suppressed competition in the market for Conventional Eggs.

334.    Accordingly, whether analyzed under the per se rule (where market power is irrelevant) or under the rule of reason, Defendants' dominance within the Conventional Egg market—and their collective ability to raise prices and restrict output—establishes market power sufficient to support the claims alleged herein.

## VIII.  ANTICOMPETITIVE EFFECTS AND INTERSTATE COMMERCE

335.    Defendants' anticompetitive conduct directly caused Plaintiffs to pay supracompetitive prices for Conventional Eggs, thereby restraining competition in the relevant market. As a result of Defendants' conspiracy to fix, raise, maintain, and stabilize the price of Conventional Eggs, Plaintiffs have suffered and continue to suffer economic harm—the full extent of which will be calculated after discovery and proven at trial.

336.    Absent Defendants' conspiracy, Plaintiffs and members of the proposed Class would have paid significantly lower, competitive prices for Conventional Eggs. The artificially inflated prices charged by Producer Defendants represent overcharges that were directly and proximately caused by Defendants' unlawful agreement.

337.    Because Defendants' conspiracy is ongoing, Plaintiffs and members of the proposed Class continue to incur antitrust injury and will do so until the anticompetitive conduct ceases, and competitive conditions are restored in the market for Conventional Eggs.

338.    The antitrust laws are designed precisely to prevent the injuries alleged here—injuries that arise when horizontal competitors coordinate pricing and restrict output. Agreements among sellers to reduce price competition, restrict capacity, or fix benchmark-linked prices constitute per se violations of the antitrust laws and cause the very type of harm Plaintiffs have suffered.

339.    Defendants' price-fixing scheme harmed competition by eliminating meaningful price rivalry among dominant egg producers and depriving purchasers of the benefits of a competitive market. By coordinating prices in lockstep and jointly restricting supply, Defendants removed incentives to compete on price, quality, service, innovation, and output, and their conduct further entrenched the already high barriers to entry in the market for Conventional Eggs.

340.    Defendants' unlawful conduct substantially affected interstate trade and commerce throughout the United States and directly caused antitrust injury to Plaintiffs and members of the proposed Class, who purchased Conventional Eggs at prices inflated by Defendants' conspiracy. Defendants' production, processing, and sale of Conventional Eggs occur in a continuous and uninterrupted flow of interstate commerce. Defendants ship eggs across state lines daily, supply national

retailers and distributors headquartered outside their home states, participate in national pricing systems (Urner Barry/Expana), and execute spot trades on ECI that result in cross-state shipment. Defendants' conduct therefore substantially affects interstate commerce.

341. Defendants' conduct substantially reduced output, increased prices beyond competitive levels for a prolonged period, distorted benchmark price discovery mechanisms, and impaired the competitive process itself by eliminating incentives for producers to independently determine price and capacity. These effects constitute substantial anticompetitive harm under any mode of analysis.

## IX.    CLASS ACTION ALLEGATIONS

342. Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representative of the proposed Class, which is defined as follows:

> All persons or entities that directly purchased Conventional Eggs from one or more Producer Defendants within the United States from January 1, 2022 through the present and until the unlawful conduct alleged herein ceases. Excluded from the Class are Defendants and their subsidiaries and affiliates; federal and state governmental entities; and any judicial officers and their staff assigned to this case.

343. The members of the proposed Class are so numerous that joinder of all members is impracticable. On information and belief, the Class includes hundreds, if not thousands, of purchasers dispersed throughout the United States.

344. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs purchased Conventional Eggs directly from one or more Producer Defendants at prices inflated by the same unlawful conspiracy alleged herein. Plaintiffs assert the same legal theories and seek redress for the same injury as each Class member.

345. Plaintiffs and all members of the proposed Class suffered antitrust injury from the same course of conduct—Defendants' conspiracy to fix, raise, maintain, and stabilize the price of Conventional Eggs and restrict production capacity. All Class members paid prices higher than they would have paid in a competitive market.

61

346.    Plaintiffs will fairly and adequately protect the interests of the proposed Class. Plaintiffs' interests are aligned with those of the Class, and Plaintiffs have retained counsel experienced in prosecuting complex antitrust and competition class actions.

347.    Common questions of law and fact predominate over any questions affecting only individual Class members. Those common questions arise from Defendants' uniform conduct and apply equally to all Class members.

348.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief appropriate under Rule 23(b)(2).

349.    Questions of law and fact common to the Class include, but are not limited to:

a.    whether Defendants entered into a contract, combination, conspiracy, or understanding to restrict or stabilize production capacity for Conventional Eggs;

b.    whether Defendants entered into a contract, combination, conspiracy, or understanding to fix, raise, maintain, or stabilize the prices of Conventional Eggs;

c.    whether Defendants coordinated their conduct to influence or manipulate benchmark prices for Conventional Eggs, including through interactions with Urner Barry/Expana and trading on ECI;

d.    whether Producer Defendants' conduct—including capacity restriction and benchmark manipulation—artificially increased the prices of Conventional Eggs purchased by Plaintiffs and the Class;

e.    whether the alleged agreements constitute per se violations of Section 1 of the Sherman Act, or, in the alternative, violate Section 1 under the rule of reason;

f.    whether the impact of Defendants' conduct on Conventional Egg prices can be demonstrated through common proof;

g.    the appropriate measure and methodology for calculating Class-wide damages; and

h.    the nature and scope of injunctive relief necessary to prevent and remedy the anticompetitive effects of Defendants' conduct.

62

350.    Plaintiffs are represented by counsel who are highly experienced in antitrust, class action, and complex commercial litigation, and who will vigorously prosecute this action on behalf of the Class.

351.    A class action is superior to other methods of adjudication for the fair and efficient resolution of this controversy. Class treatment will permit numerous similarly situated purchasers to litigate their common claims in a single forum, avoiding the inefficiency and expense of duplicative individual suits and mitigating the risk of inconsistent adjudications. The class mechanism also provides purchasers with a means of obtaining redress for injuries that, taken individually, may be too small to justify separate litigation, while collectively amounting to substantial harm.

## X.    CAUSES OF ACTION

### COUNT ONE

**Agreement in Restraint of Trade**
**in Violation of Section 1 of the Sherman Antitrust Act**

352.    Plaintiffs incorporate each of the allegations above as if fully set forth herein.

353.    Plaintiffs seek monetary and injunctive relief on behalf of themselves and the proposed Class under Sections 4 and 16 of the Clayton Act for Defendants' violations of Section 1 of the Sherman Act.

354.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the production and sale of Conventional Eggs to Plaintiffs and the proposed Class.

355.    Beginning at least as early as January 1, 2022, Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of 15 U.S.C. § 1.

356.    Specifically, Defendants undertook a coordinated effort to restrict and stabilize the supply of Conventional Eggs and to fix, raise, maintain, and stabilize the prices of Conventional Eggs. Defendants agreed to align and manipulate production decisions—including pullet placements, molting schedules, flock rebuilding, and capacity utilization—and jointly influenced benchmark pricing by

coordinating the information provided to Urner Barry/Expana and by aligning conduct on the ECI spot market.

357.    Defendants' actions were taken with the intent, purpose, and effect of artificially elevating the market price for Conventional Eggs far above competitive levels.

358.    Defendants knowingly participated in and perpetuated this conspiracy for the purpose of increasing their own profits through supracompetitive pricing.

359.    The conduct alleged herein was undertaken, facilitated, authorized, or ratified by Defendants' officers, directors, managers, agents, employees, or representatives while acting within the scope of their duties and in furtherance of Defendants' business interests.

360.    As a result of Defendants' unlawful conspiracy, Plaintiffs and the proposed Class paid supracompetitive prices for Conventional Eggs and suffered antitrust injury to their business or property.

361.    The conspiracy alleged herein constitutes a horizontal agreement among direct competitors—conduct that is per se unlawful under Section 1 of the Sherman Act.

362.    In furtherance of this unlawful agreement, Defendants committed various acts, including but not limited to: (a) coordinating production-reduction and supply-stabilization decisions designed to restrict output of Conventional Eggs; (b) manipulating benchmark prices by aligning conduct and submissions to Urner Barry and through coordinated conduct on ECI; and (c) communicating and acting in ways intended to ensure adherence to jointly shared supply and pricing objectives.

363.    There are no legitimate or procompetitive justifications for Defendants' conduct, and any purported justifications, to the extent cognizable, could have been achieved through substantially less restrictive means.

364.    Defendants' actions are unlawful under the per se rule. In the alternative, they are unlawful under "quick look" analysis or the rule of reason.

365.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs and the proposed Class have suffered and will continue to suffer economic injury and the loss of the benefits of free and fair competition unless Defendants' conduct is enjoined.

366.    Under Section 4 of the Clayton Act, Plaintiffs and the proposed Class are entitled to recover treble damages, interest, and reasonable attorney's fees and costs.

367.    Under Section 16 of the Clayton Act, Plaintiffs and the proposed Class are entitled to a permanent injunction and all other equitable relief necessary to prevent and remedy the anticompetitive effects of Defendants' unlawful conduct.

## COUNT TWO

**Unlawful Information Exchange
in Violation of Section 1 of the Sherman Antitrust Act**

368.    Plaintiffs incorporate by reference each of the allegations above as if fully set forth herein.

369.    Plaintiffs bring this claim under Sections 4 and 16 of the Clayton Act to recover damages and obtain injunctive relief for Defendants' unlawful agreement to exchange competitively sensitive information in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

370.    Beginning at least as early as January 1, 2022, and continuing through the present, Defendants entered into and participated in a contract, combination, or conspiracy to regularly exchange non-public, competitively sensitive information with their horizontal competitors in the market for Conventional Eggs.

371.    The information exchanged included, without limitation: (a) forward-looking flock-size projections, pullet placements, and capacity plans; (b) production calendars, molting schedules, and repopulation intentions; (c) inventory levels, storage decisions, export volumes, and supply-management strategies; (d) non-public pricing data, transaction details, negotiation ranges, and pricing expectations; (e) information submitted to Urner Barry for benchmark setting; and (f) bidding, offering, and trading behavior on the ECI platform.

372.    Defendants exchanged this information directly with each other, through bilateral and multilateral communications, through trade associations such as UEP and USEM, and through repeated interactions with Urner Barry and ECI—entities that collected and disseminated Defendants' non-public data in ways that facilitated coordination among competitors.

65

373. The information exchanged was not publicly available, was highly detailed and contemporaneous, and involved forward-looking business decisions, making it uniquely useful to facilitate coordinated conduct and suppress competitive rivalry.

374. Such exchanges allowed Defendants to monitor each other's production decisions, anticipate rivals' output levels and pricing intentions, and adjust their own conduct to maintain supracompetitive prices for Conventional Eggs.

375. The purpose and effect of the information exchange was to reduce strategic uncertainty, to ensure adherence to shared supply-restriction and pricing objectives, and to stabilize benchmark and transaction prices for Conventional Eggs at artificially inflated levels.

376. The information exchanged through Urner Barry was particularly harmful to competition because Producer Defendants' confidential submissions were used to generate the industry's benchmark price for Conventional Eggs, and thus directly influenced the prices paid in formula-pricing contracts throughout the United States.

377. ECI also served as a conduit for coordination: Defendants' trading positions, bidding behavior, and withholding decisions on ECI supplied competitors with sensitive information that allowed Producer Defendants to align their conduct regarding supply availability and price expectations.

378. The anticompetitive effects of Defendants' information-exchange agreement were further amplified by the absence of any regulated futures market that could have provided independent price discovery or diluted the impact of coordinated conduct in the thin ECI spot market.

379. Defendants' information-exchange practices had no legitimate, procompetitive justification. Any purported business rationales could have been achieved without sharing granular, forward-looking, competitively sensitive information with horizontal rivals.

380. Defendants' information-exchange agreement constitutes an unlawful restraint of trade under Section 1 of the Sherman Act. The agreement is unlawful under the per se rule because it facilitated a horizontal price-fixing conspiracy. In the alternative, it is unlawful under "quick look" or full rule-of-reason analysis because it had the purpose and effect of unreasonably restraining competition.

381.    As a direct and proximate result of Defendants' unlawful information-exchange agreement, Plaintiffs and the Class paid supracompetitive prices for Conventional Eggs and suffered injury to their business or property.

382.    Plaintiffs and the Class are entitled to treble damages, interest, and reasonable attorney's fees and costs pursuant to Section 4 of the Clayton Act.

383.    Plaintiffs and the Class are further entitled to injunctive relief under Section 16 of the Clayton Act to ensure that Defendants cease exchanging competitively sensitive information and to prevent future harm to competition.

## XI.    PETITION FOR RELIEF

384.    Plaintiffs petition for the following relief:

a.    a determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

b.    a determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act;

c.    a judgment and order requiring the Defendants to pay damages to Plaintiffs and members of the proposed Class, trebled;

d.    an order enjoining the Defendants from engaging in further unlawful conduct;

e.    an award of attorneys' fees and costs;

f.    an award of pre- and post-judgment interest on all amounts awarded; and

g.    such other and further relief as the Court deems just and equitable.

## XII.    JURY TRIAL DEMAND

385.    Plaintiffs, on behalf of themselves and the proposed Class, demand a jury trial on all issues triable as of right before a jury.

DATED: May 13, 2026                    Respectfully submitted,


                                       /s/ Michael Dell'Angelo

                                       Michael Dell'Angelo (*pro hac vice*)
                                       Candice J. Enders (*pro hac vice*)
                                       Zachary D. Caplan (*pro hac vice* pending)
                                       Jeremy Gradwohl (*pro hac vice*)
                                       BERGER MONTAGUE PC
                                       1818 Market Street, Suite 3600
                                       Philadelphia, PA 19103
                                       Telephone: (215) 875-3000
                                       mdellangelo@bergermontague.com
                                       cenders@bergermontague.com
                                       zcaplan@bergermontague.com
                                       jgradwohl@bergermontague.com

                                       Jenna E. Rousseau
                                       Wisconsin State Bar No. 1065236
                                       Anthony J. Steffek
                                       Wisconsin State Bar No. 1053615
                                       RENNING, LEWIS & LACY, S.C.
                                       205 Doty St., Suite 201
                                       Green Bay, WI 54301
                                       Jenna E. Rousseau: (920) 283-0708
                                       Anthony J. Steffek: (920) 283-0714
                                       jrousseau@law-rll.com
                                       asteffek@law-rll.com

                                       *Counsel For Plaintiffs*

68